FILED

2016 Jun-20  PM 01:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BRENDA MORGAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 5:14-CV-01823-CLS** |
| | ) | |
| **THE COUNTY COMMISSION** | ) | |
| **OF LAWRENCE COUNTY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDERS

Brenda Morgan's complaint alleged six claims against her former employer,

the County Commission of Lawrence County, Alabama: *i.e.*, gender discrimination

under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title

VII");[1] disability discrimination under Title I of the Americans with Disabilities Act

of 1990, 42 U.S.C. § 12111 *et seq.* ("ADA");[2] retaliation under both Title VII §

---

[1] Doc. no. 1 (Complaint), ¶¶ 78-89; *see also* doc. no. 36-1, at ECF 39 (EEOC Charge of Sex and Disability Discrimination). "ECF is the acronym for Electronic Case Filing, a filing system that allows parties to file and serve documents electronically." *Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009). Bluebook Rule 7.1.4 allows citation to "page numbers generated by the ECF header." *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing Rule 7.1.4 of *The Bluebook: A Uniform System of Citation*, at 21 (Columbia Law Review Ass'n *et al.* Eds., 19th ed. 2010)). Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination." *Wilson*, 772 F. Supp. 2d at 257 n.5. Thus, unless stated otherwise, this court will cite to the original pagination in the parties' pleadings. When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

[2] Doc. no. 1 (Complaint), ¶¶ 90-96; *see also* doc. no. 36-1, at ECF 39 (EEOC Charge of Sex and Disability Discrimination).

2000e-3(a) and ADA § 12203;[3] and age discrimination under the federal Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a)(1) ("ADEA"),[4] as well as the Alabama Age Discrimination in Employment Act, Ala. Code § 25-1-20 (1975) ("AADEA").[5]

This court, upon its own motion, ordered plaintiff to show cause why her ADEA and AADEA claims should not be dismissed due to her failure to allege that her age was the "but-for" cause of the adverse employment actions taken against her.[6] That order was based upon a series of cases in this court in which Judge William M. Acker, Jr., and the undersigned had held that "'an employee cannot claim that age is a motive for the employer's adverse conduct and simultaneously claim that there was *any other* proscribed motive involved.'" *Hendon v. Kamtek, Inc.*, 117 F. Supp. 3d 1325, 1330 (N.D. Ala. 2015) (Acker, J.) (quoting *Culver v. Birmingham Board of Education*, 646 F. Supp. 2d 1270, 1271-72 (N.D. Ala. 2009) (Acker, J.)) (emphasis in original).[7] Such holdings were based upon the Supreme Court's opinion in *Gross*

---

[3] Doc. no. 1 (Complaint), ¶¶ 97-105; *see also* doc. no. 51-1, at ECF 2 (EEOC Charge of Retaliation).

[4] Doc. no. 1 (Complaint), ¶¶ 59-71; *see also* doc. no. 51-2, at ECF 2 (EEOC Charge of Age Discrimination).

[5] Doc. no. 1 (Complaint), ¶¶ 72-77.

[6] Doc. no. 49 (Order to Show Cause), at 3-4.

[7] *See also Donald v. UAB Hosp. Mgmt., Inc.*, No. 2:14-cv-727-WMA, 2015 WL 3952307 (N.D. Ala. June 29, 2015); *Holley v. Gibco Constr., LLC*, No. 2:14-cv-2277-WMA, 2015 WL 2365580 (N.D. Ala. May 18, 2015) (same); *Savage v. Secure First Credit Union*, No. 2:14-cv-2468-WMA, 2015 WL 2169135 (N.D. Ala. May 8, 2015); *Montgomery v. Bd. of Trustees of the Univ. of*

*v. FBL Financial Services*, 557 U.S. 167 (2009), stating that, in order to prevail on a claim of age discrimination under the ADEA, "a plaintiff must prove that age was the '*but-for'* *cause* of the employer's adverse decision." *Id.* at 176 (emphasis supplied). Plaintiff responded that she could not "establish that her age was the 'but-for' cause of the adverse employment actions [taken against her]," and conceded that those claims should be dismissed.[8]

After the date on which this court entered the foregoing show-cause order, however, the Eleventh Circuit reversed Judge Acker for holding, in *Savage v. Secure First Credit Union*, 107 F. Supp. 3d 1212 (N.D. Ala. 2015) — a case in which the plaintiff had alleged claims based upon Title VII, 42 U.S.C. § 1981, the ADA, and the ADEA — that the plaintiff

> "must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, 129 S. Ct.

---

*Ala.*, No. 2:12-cv-2148-WMA, 2015 WL 1893471, at \*5 (N.D. Ala. Apr. 27, 2015); *Dixon v. Birmingham*, No. 2:13-cv-404-WMA, 2015 WL 353162, at \*1 (N.D. Ala. Jan. 27, 2015); *Ephraim v. Pantry, Inc.*, 899 F. Supp. 2d 1205, 1207-08 (N.D. Ala. 2012); *Gwin v. BFI Waste Services, LLC*, 718 F. Supp. 2d 1326, 1327 (N.D. Ala. 2010).

Moreover, Alabama and federal courts have held that the AADEA uses the same principles and analytical framework as the federal Age Discrimination in Employment Act (ADEA). *See, e.g., Robinson v. Ala. Cent. Credit Union*, 964 So. 2d 1225, 1228 (Ala. 2007) (citing *Bonham v. Regions Mortg., Inc.*, 129 F. Supp. 2d 1315, 1321 (M.D. Ala. 2001)); *Ehrhardt v. Haddad Restaurant Group, Inc.*, 443 F. App'x 452, 454 (11th Cir. 2011); *Perry v. Batesville Casket Co.*, No. 7:11-cv-994-LSC, 2013 WL 1498959, at \*3 (N.D. Ala. Apr. 10, 2013); *see also* Ala. Code § 25-1-29 (expressly providing that "the remedies, defenses, and statutes of limitations, under [the AADEA] shall be the same as those authorized by the federal Age Discrimination in Employment Act . . . .") (alteration and ellipsis supplied).

[8] Doc. no. 50 (Response to Order to Show Cause), at 2 (alteration supplied).

3

> 2343, 174 L. Ed. 2d 119 (2009).   Adopting the "but-for" cause
> requirement, instead of the "mixed motive" possibility, squares with "the
> ordinary meaning of the ADEA's requirement that an employer took
> adverse action 'because of' age[, which] is that age was the 'reason' that
> the employer decided to act." *Gross*, 557 U.S. at 176, 129 S. Ct. 2343.
> "Because an ADEA plaintiff must establish 'but for' causality, no 'same
> decision' affirmative defense can exist:   the employer either acted
> 'because of' the plaintiff's age or it did not." *Mora v. Jackson Mem'l
> Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010).  "The only logical
> inference to be drawn from *Gross* is that an employee cannot claim that
> age is a motive for the employer's adverse conduct and simultaneously
> claim that there was any other proscribed motive involved." *Culver v.
> Birmingham Bd. of Educ.*, 646 F. Supp. 2d 1270, 1271–72 (N.D. Ala.
> 2009).   Therefore, "a plaintiff must make it perfectly clear in her
> pleading that there are no proscribed motivations other than [the one
> alleged]." *Montgomery v. Bd. of Trustees of the Univ. of Alabama*, 2015
> WL 1893471, at *5 (N.D. Ala. Apr. 27, 2015).

*Savage*, 107 F. Supp. 3d at 1215 (alterations in original).   The Eleventh Circuit's

opinion reversing the district court said simply that "[i]t is a well-settled rule of

federal procedure that plaintiffs may assert alternative and contradictory theories of

liability." *Savage v. Secure First Credit Union*, No. 15-12704, slip. op. at 2 (11th Cir.

May 25, 2016) (alteration in original, citation omitted).

The Eleventh Circuit's opinion was not published.   Accordingly, it is not

binding precedent.[9]  Even so, this court construed it as a clear warning of potential

reversible error, and allowed plaintiff to reinstate her claims of age discrimination

---

[9] 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

4

under the ADEA and AADEA.[10]

The remainder of this opinion addresses the merits of defendant's "Motion to Strike or, in the Alternative, for *In Camera* Review,"[11] as well as the same party's motion for summary judgment.[12]

## I. MOTION TO STRIKE

Defendant's motion requests that this court strike: portions of the deposition testimony of Lawrence County Commissioner Mose Jones; the affidavit of former County Administrator Peggy King; and the affidavit of Tricia Galbreath, who served for a period following the resignation of Ms. King as Interim County Administrator.[13]

### A.    Deposition Testimony of Commissioner Mose Jones

Commissioner Jones testified that he "was *getting some information* that Commissioner Burch and several of them was having problems with [plaintiff, Brenda Morgan]."[14] Moreover, when plaintiff's counsel asked about the basis for the Commission's decision to eliminate the position of Deputy Director of the Lawrence

---

[10] *See* doc. no. 56 (Order Notifying Plaintiff of Right to Reinstate Age Discrimination Claims), and doc. no. 57 (notification by plaintiff of her intent to reinstate her age discrimination claims).

[11] Doc. no. 43.

[12] Doc. no. 26.

[13] Doc. no. 43 (Defendant's Motion to Strike or, in the Alternative, for *In Camera* Review), at ECF 1-3.

[14] Doc. no. 37-1 (Jones Deposition), at 18-19 (emphasis and alteration supplied).

County Emergency Management Agency, Jones stated:

A.   Well, you know, *in my opinion* — and that's the reason why I voted "no" — because, *in my opinion*, they didn't want Brenda to have the position.  Because what I told them, that if you want to eliminate the — plus they cut the pay, they cut the pay in the position.  And so, Brenda wasn't really going to apply for the lower pay, but then she went back and did apply.  And from my way of thinking on it and the reason why I voted "no" is because they didn't want her to have the position.

Q.   Who, specifically, didn't want her to have the position?

A.   *I believe* that Commissioner[s] Burch, and Prentis Davis and Joey Hargrove didn't want her to have the position. *Now, whether that is true or not, I don't know*, but I know that I know that [*sic*] they was trying to get rid of her and she knew that, too.

Q.   And those three were all Commissioners on the Commission, the County Commission, at that period of time?

A.   That's right.

Q.   *What led you to that belief? Was it statements that they made?*

A.   *What I heard, conversation.  Lawrence County is a small county, and you have a whole lot of conversation going on, and just listening to people talk and listening to her talk.*

Q.   *Do you remember specific conversations* — and I know it was a while ago — but *specific conversations*?

A.   Well, *some of them just said that they didn't want her to have the job*; they just wanted somebody else to have it.

Doc. no. 37-1 (Jones Deposition), at 20-22 (emphasis and alteration supplied).

6

The Commission objects to that testimony as being not relevant, not based on personal knowledge, and inadmissible hearsay. *See* Fed. R. Evid. 401, 602, 701.

The foregoing excerpts from the deposition of Commissioner Jones might be admissible as an "opposing party's statement," *if* Commissioner Jones had testified that Commissioners Burch, Davis, and Hargrove had said to him (or stated in his presence and hearing) that "they didn't want her to have the job; they just wanted somebody else to have it." *See* Fed. R. Evid. 801(d)(2).[15] Here, however, it is clear from the context of the contested testimony that Commissioner Jones's "opinion" (or "belief") about the motivations of the three Commissioners was *not* founded upon what any one of them had said, either to him or in his presence and hearing, but was

---

[15] Federal Rule of Evidence 801(d)(2) states that an opposing party's statement is "not hearsay" if it is offered against the opposing party, and it:

(A)   was made by the party in an individual or representative capacity; [or]

(B)   is one the party manifested that it adopted or believed to be true; [or]

(C)   was made by a person whom the party authorized to make a statement on the subject; [or]

(D)   was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

(E)   was made by the party's coconspirator during and in furtherance of the conspiracy.

The statement must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

7

instead based upon "a whole lot of conversation[s]" by unidentified third parties in the "small county."[16] That is classic hearsay within hearsay, and it cannot be reduced to admissible evidence at trial. *See* Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if *each part* of the combined statements conforms with an exception to the rule.") (emphasis supplied).

Commissioner Jones also testified that, "sometimes, it's a whole lot of politics being played."[17]  The federal anti-discrimination statutes upon which plaintiff's claims are based are not concerned with the issue of whether a majority of the five County Commissioners "didn't want [plaintiff] to have the job" for unspecified "political reasons."  Instead, those statutes are implicated only when a plaintiff demonstrates that the adverse employment actions complained of were motivated by one of the characteristics protected by federal law.[18]

Thus, the Commission's motion to strike the foregoing excerpts from the deposition of Commissioner Mose Jones is due to be granted.

## B.    Affidavit of Peggy King

Peggy King's affidavit states that the salaries of the Director and Deputy

---

[16] Doc. no. 37-1 (Jones Deposition), at 22 (alteration supplied).

[17] *Id.* at 33-34.

[18] For example, federal law prohibits discrimination on the basis of an individual's race, color, religion, sex, or national origin (Title VII), disability (ADA), age (ADEA), or in retaliation for an employee's opposition to or participation in activities to correct an employer's discriminatory practices (all of the foregoing statutes).

Director of the Lawrence County Emergency Management Agency ("EMA") discussed in an article published in the September 28, 2013 edition of *The Decatur Daily* under the title "*Salaries raised without OK vote*" (*see* the discussion in Part III.F., *infra*) were, in fact, approved by the Lawrence County Commission in 2008 or 2009.[19] Her affidavit also states that the Commission voted in October 2013 to reduce the salary of the incoming EMA Director by approximately $28,000, but that, after Johnny Cantrell was hired to fill the position vacated by Hillard Frost, the Commission voted to *increase* Cantrell's base salary.[20] Moreover, Ms. King testified that plaintiff performed "well" during her tenure as Deputy EMA Director.[21] The foregoing statements are cumulative of other evidence of record, and the motion to strike them will be denied as moot.[22]

Ms. King also testified that the interview process preceding the selection of a new EMA Director was not equitable, in the sense that the Commissioners "ma[de] it easier for [Johnny Cantrell]" than for plaintiff.[23] Defendant objects to that

---

[19] *See* doc. no. 38-1 (King Affidavit), at ECF 2; *see also* doc. no. 32-4, at ECF 69-70 (copy of article from www.decaturdaily.com) (alterations supplied); doc. no. 52-1, at ECF 2-3 (photostatic copy of article as printed in *The Decatur Daily*).

[20] Doc. no. 38-1, at ECF 3 (King Affidavit).

[21] *Id.*

[22] In other words, information provided by Ms. King's affidavit also was provided by other deponents or affiants, whose testimony has not been the object of a motion to strike.

[23] Doc. no. 38-1, at ECF 3-4 (King Affidavit) (alterations supplied).

9

testimony on the basis that Ms. King attended only one round of interviews, and has no personal knowledge regarding questions which were asked at the other rounds of interviews.[24] Because the court will not consider that statement when deciding the motion for summary judgment, defendant's motion to strike that testimony will be denied as moot.

## C.   Affidavit of Tricia Galbreath

The final aspect of the Commission's motion to strike contends that:

> The most disturbing evidence submitted in support of Plaintiff's Response [to the motion for summary judgment] is the Affidavit of [former Interim County Administrator] Tricia Galbreath, which, on its face, purports to disclose advice allegedly given by the undersigned [*i.e.*, retained trial counsel Jamie Kidd] and County Attorney Dave Martin. (Doc. 39-3.)  To say that any attorney *decided* a particular course of action is nonsense;[25] all that an attorney can do is recommend such a course to the Commission, which then must vote as a body as to whether it will follow the recommendation.  Ms. Galbreath's affidavit can thus only be based on privileged advice to which she only could have been privy in her role as County Administrator.  This affidavit is extremely prejudicial to the Commission because it cannot even contradict the allegations made therein without revealing more privileged information. The Commission therefore respectfully requests that this Affidavit be stricken.  In the alternative, the Commission respectfully requests that this Court allow it to submit evidence *in camera*, without waiving any

---

[24] *See* doc. no. 43 (Defendant's Motion to Strike or, in the Alternative, for *In Camera* Review), at 2.

[25] As will be discussed in the following text, Ms. Galbreath's affidavit states that "County attorneys Jamie Kidd and Dave Martin, along with Commissioner Bobby Burch, made the decision to eliminate the EMA Deputy Director [position] on or around September 30, 2013, when the County budget was finalized for the upcoming year." Doc. no. 39-3 (Galbreath Affidavit), ¶ 13 (alteration supplied).

> privilege, further detailing the ways in which this affidavit is an
> unconscionable breach of attorney-client privilege.

Doc. no. 43 (Motion to Strike or, in the Alternative, for *In Camera* Review), ¶ 6

(alterations, emphasis, and footnote supplied).

The only part of Ms. Galbreath's affidavit to which the attorney-client privilege

could *possibly* apply is the statement that "County attorneys Jamie Kidd and Dave

Martin, along with Commissioner Bobby Burch, made the decision to eliminate the

EMA Deputy Director [position] on or around September 30, 2013, when the County

budget was finalized for the upcoming year."[26]   Without deciding whether the

Commission satisfied its burden of proving that the foregoing statement is covered

by the attorney-client privilege, the court will not consider the statement when

deciding the motion for summary judgment.   Accordingly, the motion to strike the

affidavit of Ms. Galbreath will be denied as moot.[27]

## II. SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56 provides that summary judgment should be

rendered if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that "there is no genuine dispute as to any material fact and the

---

[26] *Id.* (alteration supplied).

[27] The Commission alternatively moves for *in camera* review of the Commission's evidence addressing plaintiff's contention that the County attorneys participated in the decisions to take adverse employment actions against plaintiff.  The court declines to do so, because the fact or degree of the County attorneys' involvement in those decisions is not material.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (alteration and emphasis supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)

(asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## III. SUMMARY OF FACTS

Plaintiff began her employment with the Lawrence County Commission in 1989, as a clerk in the Tax Collector's office.[28]  She occupied several other positions before transferring in September of 2003 to the Lawrence County Emergency Management Agency ("EMA"), where she initially occupied the "TVA Planner" position.  She was promoted to the position of "Deputy EMA Director" in 2004.[29] She described her duties in that position as "[p]lanning, mitigating, preparing, [and providing] protection for citizens of Lawrence County."[30]

Throughout most of plaintiff's tenure with the Lawrence County EMA, the agency was staffed by three persons, holding the positions of Director, Deputy Director, and TVA Planner.

## A.   Thursday, June 27, 2013

The minutes of the June 27, 2013 "Special Called Meeting" of the Lawrence

---

[28] *See* doc. no. 28-1 (Morgan Deposition), at 12.

[29] *Id.* at 11-17.  Other positions occupied by plaintiff prior to transferring to the EMA included Assistant License Inspector (1997-99) and Solid Waste Officer (1999-2003). Doc. no. 34-2, at ECF 3 (Brenda Morgan Resume).

[30] Doc. no. 28-1 (Morgan Deposition), at 17 (alterations supplied).

County Commission recorded two facts of significance to the issues in this suit. First, EMA Director Hillard Frost announced that he would retire on July 31, 2013.[31] Second, the Commissioners' unanimous decision to "borrow $400,000 . . . *to run the county for the rest of* [the] *fiscal year*"[32] reflected an unanticipated decline in the County's anticipated revenue.

**B.     Thursday, July 18, 2013**

The Commissioners' decision to borrow $400,000 for payment of the County's normal operating expenses during the two-and-a-half months remaining in the 2012-13 fiscal year was consummated during a "Special Called Emergency Meeting" of the Commission held on July 18, 2013.[33] The County's fiscal difficulties were reflected

---

[31] *See* doc. no. 28-5, at ECF 3 (Minutes of June 27, 2013 Special Called Meeting of the Lawrence County Commission).

[32] *Id.* at ECF 4 (ellipsis, emphasis, and alteration supplied). The Commissioners also discussed during this same meeting various "cost saving measures," such as the possibility of terminating all temporary employees. Ultimately, however, no action was taken on that issue at the June 27th meeting, and discussion was tabled "until more information [was] received about the temporary workers." *Id.* at ECF 4 (alteration supplied).

[33] The minutes of that meeting recorded the following action:

> The Lawrence County Commission met today in a Special Called Emergency Meeting for the purpose of considering the adoption of a resolution and order authorizing the issuance and sale of the $400,000 Certificate of Indebtedness of Lawrence County Alabama (the "Certificate"), which is to be issued in order to provide funds for current operating expenditures of the County, including the costs of issuing the Certificate, and for the purpose of considering other matters related to the Certificate. . . .

> Mr. Kane Burnette, from Bank Independent, explained that the resolution is for a $400,000 line of credit to be used solely for the operating expenses of the County. It is set to mature on February 1, 2014 with an interest rate of 5.29%. [The]

in the following letter, signed by all three EMA employees (Director Hillard Frost,

Deputy Director Brenda Morgan (plaintiff), and TVA Planner Tammy Vinson), and

delivered to the County's Interim Administrator, Tricia Galbreath, on July 18, 2013:

> We would like to address the current changes that are occurring in the Lawrence County Emergency Management Agency. *Hillard Frost has made the decision to retire after twenty four years*. There have been several disasters and changes over the past few years. After careful consideration *and due to the current county financial situation* we would like to ask the county commission *not to hire anyone at this time*. We would like to ask that you *promote Brenda Morgan from EMA Deputy Director to Director and Tammy Vinson from TVA Planner to EMA Deputy Director **and** TVA Planner*. Currently the TVA Planner is 100% paid by TVA and the Deputy Director employee is paid 30% with TVA funds and approximately 35% reimbursement paid by the Alabama EMA. *We will perform the duties required with just the two of us during this financial crisis*. We would appreciate your consideration in this matter. We only have the county's best interest at heart.
>
> Hillard Frost has agreed to assist in the event of any major disasters or events that might occur in our county. If there becomes a need for Hillard Frost to work part-time his income could be paid thru the TVA funds we receive.

Doc. no. 28-16, at ECF 2 (July 18, 2013 EMA Proposal) (all emphasis supplied); *see*

*also* doc. no. 37-1, at ECF 37 (same).

State law requires each county to have an EMA *Director*,[34] and Lawrence

---

County can pay back at any time but must all be paid by February 1, 2014. . . .

*Id.* at ECF 7 (Minutes of July 18, 2013 Special Called Emergency Meeting) (ellipses and alteration supplied).

[34] *See* Ala. Code § 31-9-10(a) (1975) (2011 Replacement Vol.).

County's agreement with the TVA requires that there be a *TVA Planner* position,[35]

but there is no requirement for the employment of a *Deputy* EMA Director.[36]

## C.    Monday, July 22, 2013

Plaintiff submitted an application for the position of EMA Director on July 22,

2013,[37] four days after presenting the foregoing EMA Proposal to the Interim County

Administrator, and nine days prior to the July 31st effective date of Hillard Frost's

retirement.

## D.    Wednesday, July 31, 2013

On the date of the July 31st effective date of Hillard Frost's retirement, the

Commission appointed plaintiff "Acting EMA Director" and commenced a search for

a permanent replacement.   The relevant portions of the "Recruiting Guidelines"

contained in the County's Personnel Handbook provided that:

>    4.3.4.   Advertisement.   Employment opportunities, other than

---

[35] *See* doc. no. 28-16, at ECF 3 (Nov. 26, 2013 Resolution Eliminating Position of Deputy EMA Director) (recording that "the TVA Planner position is required by virtue of the Lawrence County Commission's agreement or grant assurances with TVA"); doc. no. 37-1, at ECF 38 (same).

[36] Note well that, in view of the following facts recited in the July 18, 2013 EMA Proposal quoted in text — *i.e.*, the salary of the "TVA Planner" was paid *entirely* with funds supplied by TVA, and approximately 65% of the salary of the "Deputy EMA Director" was paid by state and federal funds (35% from the Alabama Emergency Management Agency, and 30% from TVA) — the proposal to promote plaintiff "Brenda Morgan from EMA Deputy Director to Director" may have resulted in little or no actual savings to Lawrence County. *See* doc. no. 28-16, at ECF 3 (Nov. 26, 2013 Resolution Eliminating Position of Deputy EMA Director) (recording that "100 percent of the salary of the TVA Planner position is funded by TVA; as a result, no cost savings would be realized if the position was eliminated"); doc. no. 37-1, at ECF 38 (same).

[37] *See* doc. no. 34-2 (Brenda Morgan Employment Application), at ECF 2.

those which have been determined to be filled through a contracted temporary services company, *will normally be advertised through an appropriate media*, to include posting at locations readily available to county employees, to ensure adequate advertisement in the recruiting area.

　4.3.5.　Content of Advertisement. All advertisements will provide a description of the job, necessary qualifications, pay grade, pay range, deadline for applying, date and time of any qualifying examination and where applications may be picked up and returned. All advertisements will contain the statement: "Lawrence County is an Equal Opportunity Employer." All advertisements will also indicate that subsequent vacancies will be filled from names on the eligibility list that will be prepared from the qualified applications and the length of time that the list will remain active.

　4.3.6.　Duration of Advertisement. All advertisements will remain open for receipt of applications for at least seven (7) calendar days from the date of the notice.

Doc. no. 34-1 (Lawrence County Personnel Handbook) §§ 4.3.4. – 4.3.6., at ECF 19

(underscored emphasis in original, italicized emphasis supplied).[38]

---

[38] Defendant alleged in its initial brief in support of summary judgment that, "[a]fter Frost officially retired, Plaintiff was temporarily appointed as acting EMA director *while the position was advertised in accordance with policy*." Doc. no. 27 (Defendant's Brief in Support of Summary Judgment), at 4 (alteration and emphasis supplied).

　Plaintiff denied that the vacant EMA Director's position was advertised "in accordance with policy." Doc. no. 32 (Plaintiff's Brief), at ECF 5. Her denial was based upon the fact that, during a Commission meeting held "on or around September 24, 2013, Commissioners Burch and Davis voted to promote a male individual to the position of County Assistant Engineer without advertising the position as required by the Handbook [provisions quoted in text]." *Id.* at ECF 14 (alteration supplied); *see also* doc. no. 28-1 (Morgan Deposition), at 96-97; doc. no. 28-2 (Burch Deposition), at 52; doc. no. 28-3 (Davis Deposition), at 43; doc. no. 37-1 (Jones Deposition), at 39 (testifying that the "procedure that [the Commission had] been following ever since [he had] been there," was: "if I'm the Assistant and if someone steps out, *then the Assistant takes over . . . .*") (alterations, emphasis, and ellipsis supplied).

　*Plaintiff failed to note, however*, that two Commissioners do not constitute a governing majority. Indeed, the motion of Commissioners Burch and Davis to hire a male County Assistant

**E.     Wednesday, September 11, 2013**

The difficult financial circumstances reflected by the Commission's decision to borrow $400,000 for payment of the County's normal operating expenses were exacerbated on September 11, 2013, when the directors of International Paper, the County's largest employer, announced that the company's Courtland plant would be closed by the end of the first quarter of 2014.  That closure left 1,100 workers jobless,[39] and adversely impacted the County's tax base.

**F.     Saturday, September 28, 2013**

One of plaintiff's duties as Acting EMA Director was to prepare a proposed agency budget for the fiscal year beginning on October 1, 2013.[40]  That proved to be an unusually stressful task as a result of the County's financial difficulties, as well as the allegations contained in an article published in the September 28, 2013 edition of *The Decatur Daily*, and entitled "*Salaries raised without OK vote:  LawCo unaware TVA funds went to EMA officials*."  The full text of that article read as follows:

---

Engineer without advertising the position vacancy in accordance with Personnel Handbook § 4.3.4 *did not pass.  See* doc. no. 37-1 (Jones Deposition), at 42-43.  Moreover, plaintiff admitted that the "Lawrence County Personnel Handbook . . . prescribes the procedures that the [Commission] must follow when hiring, firing and disciplining employees.  Under the hiring procedures set forth in the Handbook, the [Commission] *is required to advertise vacant positions*. . . ." *Id.* (ellipses, alterations, and emphasis supplied).

[39] *See* http://www.al.com/business/index.ssf/2013/09/international_paper_largest_em.html ("International Paper, largest employer in Lawrence County, to close plant by early 2014, lay off 1,100") (last visited Apr. 20, 2016).

[40] *See* doc. no. 28-1 (Morgan Deposition), at 30.

MOULTON — Two Lawrence County Emergency Management Agency employees received raises that were never approved, county officials said Thursday.

The County Commission plans to rectify the matter by reducing pay for both positions when it approves its budget Monday.

Interim County Administrator Tricia Gilbreath [*sic*] said for some reason, 30 percent of the money the county receives from the Tennessee Valley Authority went to salaries of ex-EMA Director Hillard Frost and Assistant Director Brenda Morgan.  Lawrence County receives the money because of its location near [TVA's] Browns Ferry Nuclear Plant.

The move increased Frost's pay to more than $80,000 annually and put Morgan's salary at more than $64,000 per year.  Morgan County is more than twice the size of Lawrence County, and its EMA director makes just more than $60,000 annually.

Gilbreath [*sic*] said she cannot find anything in the minutes about a Commission vote to reclassify the two positions.  It was not known how much Frost and Morgan were making before they began receiving the TVA money.

Interim administrator Donna Llewellyn said only the commission can authorize employee raises.  She said 30 percent of the $123,000 the county gets annually is being used to supplement salaries.

Mose Jones is the only commissioner who was in office when Frost and Morgan started receiving the money in 2008.  He said he remembers the commission discussing the money but couldn't remember if there was a vote.

"What is the county paying them?" Jones asked.

"Too much," Commissioner Joey Hargrove said.

19

Morgan has been serving as [Acting EMA] director since Frost retired this past summer. She was not aware of the commission's discussion and declined to comment on the matter.

The commission is proposing to cut the director's pay to $48,951, which still is more than what Colbert and Winston counties pay their director.

Morgan's pay would be trimmed from $64,640 to $41,962 annually.

The commission also agreed to re-advertise for a permanent director and post the new salary.

"Since we have an opening, now is the time to fix the classification problem," Commissioner Bobby Burch said.

He said the county had been using general fund money to supplement EMA services such as evacuation planning because the salaries were "eating up the TVA money."

Llewellyn said EMA has a planner, but unlike Frost and Morgan, all of her $59,034 annual salary is coming from TVA and 911 money.

Burch said the county could have used part of the TVA money to help buy public storm shelters and weather sirens after the April 27, 2011, tornado outbreak that killed 14 in Lawrence County.

Doc. no. 32-4, at ECF 69-70 (copy of article from www.decaturdaily.com) (alterations

supplied); *see also* doc. no. 52-1, at ECF 2-3 (copy of same article as printed in *The*

*Decatur Daily*).

## G.   Monday, September 30, 2013

Just two days after publication of the *Decatur Daily* article, the County

20

Commission met for the purpose of adopting a budget for the 2013-14 fiscal year. Plaintiff attended in order to address three potential EMA budgets that she had prepared,[41] but the majority of her presentation was devoted to refuting the *Decatur Daily*'s accusation that she and Hillard Frost had received "raises that were never approved" by the County Commission,[42] and attacking the credibility of the person identified by the newspaper's reporter as the source of that charge:  Interim County Administrator Tricia Galbreath.

As will be discussed more fully in Part III.Q. of this opinion, *infra*, Lawrence County Commission Chairman Prentis Davis subsequently cited plaintiff's behavior during the September 30th Commission meeting as one basis for the adverse employment actions that led to this suit.  He accused her of being "disrespectful" when addressing members of the Commission, "insubordinate" when questioning the Commissioners' "judgment" about budgetary decisions affecting the County EMA office (and particularly her own salary), and "abusive" when confronting the Interim County Administrator about statements attributed to her in the newspaper article.[43]

----

[41] Throughout plaintiff's comments to the Commissioners, she repeatedly referred to her budget proposals by the letters "A," "B," and "C."

[42] *See, e.g.*, doc. no. 32 (Plaintiff's Response in Opposition to Summary Judgment), ¶ 14, at ECF 6 ("Plaintiff disputes that she came to the September 30, 2013 meeting to simply present the budget she had prepared. Rather, Plaintiff came to the September 30, 2013 meeting to correct certain inaccuracies regarding the EMA budget presented at the previous meeting that she was not present for [*sic*] that were subsequently printed in the paper.") (citation omitted).

[43] Doc. no. 28-15, at ECF 6 (Oct. 30, 2013 Letter).

This court listened to an audio recording of the Commission meeting,[44] and directed an official reporter to prepare a transcript.  A copy of the transcript is attached to this opinion as an "Appendix."[45]

Chairman Davis and other Commissioners asked plaintiff on several occasions to "move on," and to confine her comments to the three budget proposals she had prepared, but she repeatedly focused her remarks on her salary, and what she described as "rumor control" necessitated by the *Decatur Daily* article.[46]

Plaintiff hand-printed numbers beside ten of the eighteen paragraphs of the newspaper article,[47] and distributed copies to each Commissioner.  She sequentially addressed each of the numbered paragraphs, while posing rhetorical questions to the Commissioners, such as:  "Did y'all approve the budgets the last two years . . . ?"[48] When Mose Jones — the only Commissioner who expressed support for plaintiff

---

[44] Doc. no. 29 (Recorded Audio Files Stored on CD).

[45] As frequently is the case, a cold, typewritten transcript is a poor substitute for hearing the tone of words actually spoken.

[46] Appendix, at 11 (doc. no. 27, at Track 4, 1:20).

[47] *See* doc. no. 52-1, at ECF 2-3 (a copy of the article as printed in *The Decatur Daily*, and bearing plaintiff's handwritten numbers beside ten of the article's eighteen paragraphs).

[48] Appendix, at 13 (doc. no. 27, at Track 4, 1:35) (ellipsis supplied).  The significance of plaintiff's rhetorical question was based upon these facts: four of the five members of the Lawrence County Commission were "new," in the sense that they had been elected in 2010; and, the Interim County Administrator (also a new appointee) could find no evidence in Commission minutes that the amounts paid as annual salaries to Hillard Frost and plaintiff had been approved by the County Commissioners who served prior to 2010.  Hence, plaintiff was arguing that the lack of minute entries was unimportant, because the incumbent Commissioners had approved the EMA's budgets — which clearly depicted the amounts paid as salaries to each EMA employee — during the two previous fiscal years.

during the meeting — addressed a subject in one of the paragraphs toward the *end* of the newspaper article, plaintiff chided him: "If you will stay in number, I won't have to flip back and forth."[49]

At another point, after being asked by Chairman Davis to "stay on [the] budget," plaintiff rebuffed him, saying: "Let's get back on this [*i.e.*, discussion of the *Decatur Daily* article], please."[50]

Plaintiff's tone when addressing Interim County Administrator Tricia Galbreath was argumentative and, at times, disrespectful.  For example, when Galbreath attempted to speak in her own defense about plaintiff's accusation that Galbreath had either failed or refused to distribute copies of job descriptions for the EMA Director and Deputy Director positions to all members of the Commission, plaintiff snapped: "You don't have to speak.  I'm passing it around."[51]  Her anger was barely suppressed under a thin veneer of courtesy.

Plaintiff berated Galbreath for telling the newspaper reporter that Hillard Frost's salary as EMA Director "was more than $80,000 annually."[52]  It appears that amount was *an aggregate of salaries separately paid to Frost for two County*

---

[49] Appendix, at 19 (doc. no. 27, at Track 7, 0:28).

[50] Appendix, at 27 (doc. no. 27, at Track 9, 0:15) (alterations supplied).

[51] Appendix, at 16 (doc. no. 27, at Track 5, 4:10).

[52] Doc. no. 52-1, at ECF 2 (paragraph bearing plaintiff's handwritten number "3").

*positions held by him*: *i.e.*, Director of the Lawrence County EMA, and Director of the Lawrence County 911 Center.[53]  Plaintiff rebuked Galbreath, saying:  "You are the County Administrator — acting.  You should have known the difference."[54]

Plaintiff subsequently attempted to excuse her behavior by saying that she had "little sleep" prior to the September 30th Commission meeting, and that she had done "the best [she] could do" under the circumstances.[55]  Nevertheless, plaintiff chose to express what may have been valid concerns about the accuracy of the *Decatur Daily* article in a manner that left her vulnerable to Chairman Davis's accusation that her behavior had been "disrespectful," "insubordinate," and "abusive."

## H.    Thursday, October 3, 2013

Three days after plaintiff's appearance at the Commission's September 30th budget meeting, she told her EMA co-worker, Tammy Vinson, that "snakes were out to get her and those snakes had revealed theirselves [*sic*]," but "she had took [*sic*] care of them," or "chopped their heads off."[56]  On the same morning, plaintiff told Vinson that

files were missing out of her office.  She said the only person that had

---

[53] *See* doc. no. 28-1 (Morgan Deposition), at 38.

[54] Appendix, at 21 (doc. no. 27, at Track 7, 2:40).

[55] *See* doc. no. 28-1 (Morgan Deposition), at 118 (alteration supplied).

[56] Doc. no. 28-12 (Transcript of Feb. 3, 2014 Personnel Board Hearing:  Vinson Testimony), at 140-41.

> a key was me and Hillard, and Hillard was in Orange Beach. And I told her, I said, I promise you, I haven't took [*sic*] anything out of your office. And she said, okay. And I said, I promise I haven't took [*sic*] anything out of your office.

Doc. no. 28-12 (Transcript of February 3, 2014 Personnel Board Hearing: Vinson Testimony), at 99; *see also id.* at 125.

Later that same day, plaintiff told Vinson that she was experiencing high blood pressure and "needed to rest."[57] She decided to take sick leave.[58] Vinson agreed to respond to emergency calls while plaintiff was out of the office.[59] Vinson testified that plaintiff appeared "a little distraught," "stressed," and "out of sorts" before leaving the office.[60]

## I.   Friday, October 4, 2013

Sometime during the "middle of the night between Thursday, October 3, 2013, and Friday, October 4, 2013,"[61] plaintiff received a telephone call from a 911

---

[57] Doc. no. 28-1 (Morgan Deposition), at 63.

[58] *See id.*

[59] *See* doc. no. 28-12 (Transcript of Feb. 3, 2014 Personnel Board Hearing: Vinson Testimony), at 140-41.

[60] *Id.* at 112, 120.

[61] This statement was stipulated by the parties as the time frame within which events critical to the issues of this case occurred. *See* doc. no. 55 (Joint Stipulations of Fact) ¶ 1 ("The middle of the night between Thursday, October 3, 2013, and Friday, October 4, 2013, is when Plaintiff entered the Hill residence."). The parties also stipulated that statements contained in letters from Commission Chairman Prentis Davis to plaintiff "citing the incidence as having occurred in the middle of the night between October 5, 2013, and October 6, 2013 . . . *are not correct.*" *Id.* ¶ 2 (ellipsis and emphasis supplied, internal citations omitted).

operator. She recounted the ensuing conversation as follows:

> I remember picking up the phone and the dispatch telling me that there
> had been a wreck in the Bankhead Forest, it had a fatality, and that there
> was some diesel spill or something to the effect that it probably had
> burned up but that they need[ed] — they had requested EMA. And I —
> she said something about they had called ADEM [*i.e.*, the Alabama
> Department of Environmental Management], and they said, Call EMA
> first. And I had explained to the dispatcher that I was on leave and that
> I wasn't supposed to be receiving this call, and she said, Oh, I wasn't
> aware. And I paused and I thought, Tammy is going to be working
> tomorrow, so I'll take the call and respond to it where she can have her
> sleep to do EMA on Friday [*sic*].

Doc. no. 28-1 (Morgan Deposition) at 67 (alterations supplied).[62] Plaintiff testified

that she also was "concerned about [the security of] her job" if she did not personally

respond to the call for emergency assistance.[63]

As plaintiff drove toward the accident site, however, the fatigue and stress that

had caused her to take sick leave increasingly weighed upon her — so much so that

she reached the point of believing that she would be "taking [her] life in danger" if

she continued her journey.[64] She also testified that she was "not thinking straight,"

and was "scared to be in the Bankhead Forest."[65] Plaintiff cited her fatigue, stress,

---

[62] *See also* doc. no. 36-2 (Vinson Deposition), at 11; doc. no. 28-3 (Davis Deposition), at 79.

[63] Doc. no. 28-12 (Transcript of Feb. 3, 2014 Personnel Board Hearing: Morgan Testimony), at 78 (alteration supplied).

[64] Doc. no. 28-1 (Morgan Deposition), at 68 (alteration supplied).

[65] *Id.* at 84 ("Before I went any further to a wreck, not one step further was I going to go. On the way, I was thinking and not knowing nothing. It was time to pause because I was not thinking straight."); *id.* at 82 (describing her feeling that something bad would happen to her in the Bankhead Forest).

and fears as reasons for her stopping, *en route* to the accident site, at the residence of an elderly couple named Martha and Thurston Hill.

She did not immediately approach the Hills' home, but instead pulled into the driveway of the house located next door: the home of the Hills' daughter and son-in-law, Sandra and Ricky Nelson.[66] She sounded her automobile's horn in an attempt to attract the attention of the sleeping occupants, but eventually realized that was "not a good idea," because Sandra and Ricky Nelson did not know her.[67] So, she "pulled out of the [Nelsons'] driveway, [and] . . . into Thurston and Martha Hill's driveway."[68]

It then was the early morning hours of Friday, October 4th,[69] and the house was dark as plaintiff walked to the front entrance. She knocked, and when no one responded, she turned the knob and found that the door was not locked.[70] She entered, and was confronted by Mr. and Mrs. Hill in their hallway. Plaintiff attempted to explain her reasons for entering the home unbidden, and asked if she could use their telephone to call Tammy Vinson and request that she report to the

---

[66] *Id.* at 68-69 (stating that, even though she "had thought about stopping at Thurston and Martha Hill's house," she remembered "that he had been sick, and I said, I just don't want to stop there.  And I pulled in their daughter's driveway and blowed . . . .") (ellipsis supplied).

[67] *Id.*

[68] *Id.* (alterations and ellipsis supplied).

[69] *See supra* note 61.

[70] Doc. no. 28-1 (Morgan Deposition), at 69; doc. no. 28-12 (Transcript of Feb. 3, 2014 Personnel Board Hearing:  Morgan Testimony), at 39, 41.

accident scene.[71]

Notably, plaintiff had a cellular telephone and a radio in her truck, but she had not attempted to use either device before entering the Hills' residence and asking for permission to use their land-line telephone.[72]

Later that same morning (and during regular business hours), the Hills' daughter, Sandra Nelson, drove to the Lawrence County EMA office to report the incident in person.[73] According to Tammy Vinson, who received her complaint, Mrs. Nelson reported that a lady named "Morgan" had identified herself as working for EMA, and pulled into the driveway of her home after midnight,[74]

> blowing her horn and all. And she said, me and my husband was getting up and . . . I saw her go into my mother's house. [Ms. Morgan] was real upset and said she kept telling her, said you know me. And she said she would pull her shirt up and show her EMA badge and said that I work for EMA, you know me. And she stated then, she said that she seemed upset. *And she said, they're trying to set me up, they're trying to kill me.*

---

[71] *See* doc. no. 28-1 (Morgan Deposition), at 69.

[72] *See id.* at 84 ("Radios and phones do not pick up there in Bankhead Forest in a lot of areas.").

[73] *See* doc. no. 55 (Joint Stipulations of Fact) ¶ 3 ("Friday, October 4, 2013, is when Sandra Nelson came to the EMA/911 office and reported the incident to Tammy Vinson and the other women in the EMA/911 office. (Doc. 28-14)."). *See also* doc. no. 28-12 (Transcript of Feb. 3, 2014 Personnel Board Hearing: Vinson Testimony), at 102; doc. no. 28-14 (Written Statements by Tammy Vinson, Donna Campbell, Judy Letson, and Rhonda Dunlop); doc. no. 36-2 (Vinson Deposition), at 13-15.

[74] *See* doc. no. 55 (Joint Stipulations of Fact) ¶ 1 ("The middle of the night between Thursday, October 3, 2013, and Friday, October 4, 2013, is when Plaintiff entered the Hill residence.").

Doc. no. 28-12 (Transcript of February 3, 2014 Personnel Board Hearing: Vinson Testimony), at 102-03 (ellipsis, alteration, and emphasis supplied).

## J.   Sunday, October 6, 2013

Plaintiff delivered a card to Tammy Vinson's home on the Sunday following the foregoing events, for the stated purpose of expressing that she "trusted" Vinson.[75] When asked during deposition whether she had enclosed money within the card, plaintiff testified that she did "not recall."[76]

Later that same day, while visiting her mother, plaintiff attempted to call her husband. The first telephone unit that plaintiff attempted to use had no dial tone, and she concluded that someone had "cut" the line to her mother's home.[77] Plaintiff then used her mother's cell telephone to call the 911 center, to ask that law enforcement officers be dispatched to her mother's home.[78] When the officers arrived, however, plaintiff did not come to the door. Instead, she told the officers *through an open window* that another telephone unit in her mother's house had functioned properly, and she apologized for the inconvenience she had caused.[79] The officers reported that

---

[75] Doc. no. 28-1 (Morgan Deposition), at 74-77.

[76] *Id.* at 78.

[77] *Id.* at 78-79, 85; *see also* doc. no. 28-12, at 54 (Transcript of Feb. 3, 2014 Personnel Board Hearing: Morgan Testimony).

[78] *See* doc. no. 28-1 (Morgan Deposition), at 79; doc. no. 55 (Joint Stipulations of Fact) ¶ 4 ("Plaintiff's 911 call occurred on Sunday, October 6, 2013. (Doc. 32-3 at p. 78).").

[79] *See* doc. no. 28-12, at 150-51 (Transcript of Feb. 3, 2014 Personnel Board Hearing: Davis

plaintiff also said that "*she loved them*."[80]

Plaintiff subsequently provided two incoherent explanations for her conclusion that "someone" had "cut" the telephone line to her mother's home.  The first was given during her February 3, 2014 Personnel Board hearing:

> My mother had had problems with a neighbor prior.  And she had told me something.  My husband and I had been out of town and — for just — on a Friday night.  And she had told me that the neighbor had said something to her about — we were in Tennessee and my mom did not even know we were in Tennessee.  My mom said that this neighbor had said he had connections in Tennessee.

Doc. no. 28-12 (Transcript of Personnel Board Hearing:  Morgan Testimony), at 55.

The second explanation was provided during her August 25, 2015 deposition:

> I had picked up my — one of my mother's cordless phones to call my husband and it did not work, and my mother had just told me something that upset me concerning one of her neighbors that she had had some disputes with, [who] said something about — my husband and I had went to Tennessee on Friday night, and I was trying to get some sleep and he — she had talked to her neighbor and he said something about he had connections in Tennessee.  And I said, What are you talking about?  She said, Well, I don't know.  I didn't even know you were in Tennessee.  And when I called my husband — and I could not get him on the phone because the phone — I thought the phone line had been cut.  I picked up, to the best of my knowledge, my mom's

---

Testimony); doc. no. 28-1 (Morgan Deposition), at 85 ("I had picked up one of my . . . mom's other cell — cordless phone [*sic*], and it worked.  I had found out that the other phone, the battery had died.  I was really embarrassed, and I opened up the window when the cop was getting out of the car and I told him that the phone line was not cut and I was sorry, or something to that effect, for making the call.") (ellipsis supplied).

[80] Doc. no. 28-12, at 151 (Transcript of Feb. 3, 2014 Personnel Board Hearing:  Davis Testimony) (emphasis supplied).

cellphone and called 911 because I thought the phone line had been cut.

Doc. no. 28-1 (Deposition of Brenda Morgan), at 78-79 (alteration supplied).

The 911 dispatch operator reported the foregoing incident to Tammy Vinson;[81] and she, in turn, forwarded the report to the Chairman of the Lawrence County Commission, Prentis Davis.[82]

## K.    Monday, October 7, 2013

Ricky Nelson reported plaintiff's invasion of his father- and mother-in-law's home by a telephone call to the Lawrence County Sheriff's Office on the morning of Monday, October 7, 2013.[83]   He described plaintiff as being "kind of hysterical, rambling on about somebody trying to get her, needing some help . . . that she felt like she'd been kind of lured up there."[84]   Captain Tim McWhorter of the Lawrence County Sheriff's Office later testified that the Hill family reported the incident to him *for safety reasons*, because "they were afraid . . . that something could have happened" — specifically, that "*Mrs. Morgan could have got harmed, got shot.*"[85]

---

[81] *See id.* at 107; *see also* doc. no. 36-2 (Vinson Deposition), at 14.

[82] *See* doc. no. 28-15, at ECF 7 (Notice of Proposed Action); doc. no. 28-3 (Davis Deposition), at 85.

[83] *See* doc. no. 28-13 (Lawrence County Sheriff's Office Criminal Investigation Division Report); doc. no. 55 (Joint Stipulations of Fact) ¶ 5 ("Ricky Nelson reported the incident to the Lawrence County Sheriff's Office on Monday, October 7, 2013. (Doc. 28-13).").

[84] Doc. no. 28-12 (Transcript of Feb. 3, 2014 Personnel Board Hearing:  McWhorter Testimony), at 83, 87 (ellipsis supplied).

[85] *Id.* at 92 (ellipsis and emphasis supplied).

31

Prentis Davis, the Chairman of the Lawrence County Commission, related a telephone conversation with Martha Hill on this same date, during which she told him that plaintiff

> had came [*sic*] into her house around 1:00 or 2:00 *and was basically yelling and screaming.* And I believe she said she was in the bed at the time and she got up and — her and her husband got up and looked down the hallway and seen that there was definitely somebody in the house. And she, I guess, approached Mrs. Morgan [plaintiff]. And she said *she was screaming and flashing her shirt that she was from EMA, somebody was trying to get her,* ["]*they're on to me.*["]
>
> . . . .
>
> [Martha Hill] . . . was definitely concerned. She did mention, she said, ["]*Lord, child, we'll just call the law and get you some help.*["] Then she told me that Mrs. Morgan said, ["]*Lord, don't do that, they're in on it, too.*["]

Doc. no. 28-12 (Transcript of February 3, 2014 Personnel Board Hearing: Davis Testimony), at 145-46 (ellipses, emphasis, and alterations supplied).

Commissioner Jon Mark Nelson testified that Thurston and Martha Hill were regular patrons of his convenience store,[86] and they had told him on some date shortly after the incident "that Ms. Morgan had come into their house while they were sleeping[,] *yelling about people being after her.*"[87]

Plaintiff's subsequent assessment of her behavior demonstrated a lack of

---

[86] Doc. no. 28-20 (Nelson Declaration), ¶ 2.

[87] *Id.* ¶¶ 2-3 (alteration and emphasis supplied).

32

insight into both its bizarre nature *and* its dangerousness.  She said: "I don't know how I could have handled it any better."[88]  She testified that she "apologized to Mrs. Hill that night, and [Mrs. Hill] told [her] that she had no problems whatsoever with [her] being there."[89]  Plaintiff also alleged that she and Mrs. Hill "sat down and had coffee," and reminisced about "old times," following her unauthorized entry.[90]  When asked during the February 3, 2014 Personnel Board hearing whether she had told the Hills that "somebody was trying to kill her," plaintiff replied:  "Not that I recall."[91]

After Commission Chairman Prentis Davis learned of the events that had occurred over the preceding weekend, he sent the following letter to plaintiff on Monday, October 7, 2013:

> This letter is to notify you that you are being placed on administrative leave with pay pending an investigation into recent events suggesting that you may no longer be qualified to hold your position.  This action is not punitive or disciplinary in nature; rather, it arises out of my concern for the safety of citizens of Lawrence County, including yourself.  While you are on administrative leave, you are not authorized to take any actions or perform any work on behalf of Lawrence County.  Accordingly, you are required to turn over any and all County property currently in your position.

Doc. no. 28-15, at ECF 2 (Oct. 7, 2013 Letter).

---

[88] Doc. no. 28-12 (Transcript of Feb. 3, 2014 Personnel Board Hearing: Morgan Testimony), at 37.

[89] *Id.* at 43 (alterations supplied).

[90] *Id.* at 44.

[91] *Id.* at 69 (alteration supplied).

L.     **Tuesday, October 8, 2013**

Several significant events are recorded in the minutes of the regular meeting

of the Lawrence County Commission that occurred on Tuesday, October 8, 2013.

First, the Commissioners discussed the question of

> whether the EMA Director position should be an exempt employee or
> not[,] *and what* [the pay] *grade* [or classification for] *this position*
> *should be.*   TVA funding for this position was also discussed.
> Commissioner Hargrove made a motion to table until next meeting and
> to ask a TVA representative to come and explain their funding at that
> time.  Commissioner Jones gave a second and all Commissioners voted
> aye.

Doc. no. 28-5, at ECF 12 (Oct. 8, 2013 Minutes) (alterations and emphasis supplied).

The Commission later voted to "go into executive session" for the purpose of

discussing "an individual employed by the county [*sic*] and some considerations that

need to be dealt with by the County."[92]

After emerging from executive session, the Commissioners voted unanimously

to amend the previously-published agenda to include consideration of the following

resolutions:

> RESOLUTION RELATING TO EMPLOYMENT OF
> BRENDA MORGAN:
> The resolution states that Ms. Morgan is placed on administrative leave
> with pay effective October 2, 2013 [*sic*] and that *the Chairman is*
> *designated as the appointing authority of Ms. Morgan.* Commissioner
> Burch made a motion to adopt this resolution with a second from

---

[92] Doc. no. 28-5, at ECF 16 (Minutes of Oct. 8, 2013 Meeting).

34

Commissioner Nelson.    All Commissioners voted aye except
Commissioner Jones who abstained.

RESOLUTION APPOINTING ACTING EMA DIRECTOR:
This resolution states that Tammy Vinson is appointed as acting
Director of Lawrence County Emergency Management Agency until
further notice. Commissioner Hargrove made a motion to adopt this
resolution with a second from Commissioner Burch. All commissioners
voted aye.

*Id.* at ECF 17 (emphasis supplied).

## M.    Thursday, October 10, 2013

Two days after the foregoing Commission meeting, Chairman Davis hand-

delivered the following letter to plaintiff:

The Lawrence County Commission voted to make me your
appointing authority as of October 7, 2013.  As your appointing
authority, I am notifying you of a meeting to be held on Monday,
October 14, 2013, at 10:00 a.m. at the law office of David L. Martin at
681 Main Street in Moulton regarding your employment.

As stated in my letter to you of October 7, 2013, recent events
suggest that you may no longer be qualified to hold your position with
the Lawrence County Emergency Management Agency. The purpose of
the October 14 meeting is simply to discuss the events with you.

An investigation of these matters is ongoing. No discipline of any
kind has been proposed.  We just want to hear your side of the story so
that the Lawrence County Commission can determine the best way to
proceed in order to ensure that the safety of all citizens of Lawrence
County, including you, is protected.

If you cannot attend this meeting, please contact me at
256-565-7393 as soon as possible.  If you are unable to reach me, you

35

may contact County Administrator Tricia Galbreath at 256-974-2401.

Please be aware that failing to attend this meeting without calling to re-schedule will be considered to be violation of a direct order of your appointing authority.

Doc. no. 28-15, at ECF 3 (Oct. 10, 2013 Letter).

### N.   Monday, October 14, 2013

Plaintiff met with Chairman Davis on October 14, 2013, in accordance with the directive contained in the foregoing letter.

### O.   Thursday, October 17, 2013

Three days after that meeting, Chairman Davis hand-delivered a third letter to plaintiff, stating simply that she would "remain on administrative leave with pay until further notice."[93]

### P.   Tuesday, October 22, 2013

The minutes of the October 22, 2013 regular meeting of the Lawrence County Commission record the following actions affecting the vacant EMA Director position:

EMA CLASSIFICATIONS:
There was discussion about a representative from TVA possibly being able to come speak at the next meeting.

Commissioner Hargrove made a motion to put the EMA Director position in [the County's Pay Classification] Class XI with the TVA money included in the salary[, and] not in addition to.  Commissioner

---

[93] *See id.* at ECF 5 (Oct. 17, 2013 Letter) ("This letter is to notify you that you will remain on administrative leave with pay until further notice.").

Burch gave a second and all Commissioners voted aye except Commissioner Jones who voted no.

*Commissioner Hargrove made a motion to table the Deputy Director Classification.   Commissioner Jones gave a second and all Commissioners voted aye.*

EMA POSITION:
There was discussion on contacting the applicants to let them know of the Pay Classification change. Commissioner Nelson made a motion to re-advertise for the EMA Director Position with the [new, starting] Pay Classification included. The people that have already applied will be contacted to see if they still want their application considered. Commissioner Jones gave a second. Commissioners Jones and Nelson voted yes while Commissioners Burch and Hargrove abstained. Motion passes.

Doc. no. 28-5, at ECF 20 (Oct. 22, 2013 Minutes) (alterations and emphasis supplied).  The significance of changing the payroll classification for the EMA Director position from a "Class XIV" to a "Class XI" was that the annual salary of the person selected to replace Hillard Frost would be approximately $28,000 less than the amount previously paid to Frost.[94]

It is important to note the "motion to table the Deputy Director classification."[95] That action suggests that the Commission was contemplating *elimination* of the Deputy EMA Director position as early as October 22, 2013.

---

[94] *See* doc. no. 38-1 (Affidavit of Peggy King), ¶ 7, at ECF 3 ("I attended a Commission Meeting in October of 2013 where the Commission voted to reduce the EMA Director's pay grade level classification from a level XIV to a level XI, equating to approximately a $28,000 pay cut for the incoming EMA Director. . . .") (ellipsis supplied).

[95] *Id.* ¶ 3.

**Q.**   **Wednesday, October 30, 2013**

Chairman Davis hand-delivered a fourth letter to plaintiff on October 30th,

stating that he intended to terminate her employment, for cause, on November 5th:

> This letter is a Notice of Proposed Action under Section 9.11.2 of
> the Lawrence County Personnel Handbook. This will serve to inform
> you that *I intend to terminate your employment* with the Lawrence
> County Commission, *effective November 5, 2013*, for the following
> Group Two violations:
>
> 9.6.19: Abusive Conduct
>
> 9.6.21: Conduct Unbecoming an Employee
>
> 9.6.22: Insubordination
>
> 9.6.30: Other Unacceptable Conduct
>
> This termination is based on the culmination of an investigation
> into recent events in which you were involved. The events have
> damaged relationships in the community, with the members of the
> Lawrence County Commission and within the Lawrence County
> Commission office, while also raising serious questions regarding your
> judgment and leadership abilities.
>
> The first incident is your behavior at the meeting of the Lawrence
> County Commission on September 30, 2013, where you were
> disrespectful towards the members of the Commission and openly
> questioned their judgment in regard to making budgetary decisions
> affecting the EMA, including your salary. The conduct constituted
> insubordination.
>
> Further, you were abusive towards your co-employee, Ms. Tricia
> Galbreath. I understand that you may have some kind of dispute with
> Ms. Galbreath; however, you have made it clear several times,

38

including in our meeting of October 14, 2013, that you are unwilling to attempt to resolve this dispute in a professional and courteous manner. It is of particular concern to me that you have discussed this dispute with other employees, referring to Ms. Galbreath as a "snake" on more one occasion.

The second incident occurred on October 5, 2013[96] when you entered a private home uninvited shortly after 1:00 a.m. while in route to an unrelated emergency call.

The third incident occurred on October 6, 2013 when you called 911 from your mother's residence in Moulton and made a false allegation that her phone lines had been cut.

Your behavior on any of these occasions was unacceptable for any employee of the Lawrence County Commission, much less for someone in the position of acting EMA Director.

You have a right to respond to the above matters orally or in writing within three (3) business days. *You also have the right to request an informal hearing in front of me, where you may present evidence on your behalf.* You may either represent yourself and/or be represented by a person of your choosing. *If you choose to request a hearing, this hearing will be held on November 5, 2013* at 2:00 p.m. at the meeting room of the Lawrence County Commission, located at 12001 Alabama Highway 157, Moulton, Alabama.

If you do not request a hearing or otherwise respond to this Notice, your termination will be effective on November 5, 2013. In the event that you request a hearing, your administrative leave with pay will end on November 5, 2013. However, you may use your vacation or any other paid leave time after that date.

Doc. no. 28-15, at ECF 6 (Oct. 30, 2013 Letter) (footnote and emphasis supplied).

---

[96] The parties stipulated that this date is not correct. *See* doc. no. 55 (Joint Stipulations of Fact), at 2, ¶ 1 ("The middle of the night between Thursday, October 3, 2013, and Friday, October 4, 2013, is when Plaintiff entered the Hill residence.").

**R.     Friday, November 1, 2013**

Plaintiff exercised the right outlined in the preceding letter to request a hearing before Chairman Davis.  In preparation for it, she drafted with the aid of an attorney-friend an affidavit for execution by Martha Hill.  Plaintiff took the affidavit to Mrs. Hill, who signed it on Friday, November 1, 2013.[97]  The full text of that document reads as follows:

> 1.  My name is Ms. Martha Hill.  I am a resident of the State of Alabama and am over the age of twenty-one and competent to give this statement.
>
> 2.  On October 4, 2013, Ms. Brenda Morgan came to my house about 1:00 a.m.  *I have known Brenda for over 30 years.  Brenda asked if she could come in my house* and make some telephone calls.
>
> 3.  *I allowed Brenda to come in my house* and make her calls. Brenda seemed very tired and did not think she could go into the Bankhead Forrest [*sic*] to check on a truck accident.  Brenda called someone and asked if that person could check on the accident.
>
> 4.  I did not have a problem with Brenda coming to my house that evening.

Doc. no. 39-2 (Hill Affidavit) (emphasis supplied).[98]

**S.     Tuesday, November 5, 2013**

---

[97] *See* doc. no. 39-2 (Hill Affidavit), at ECF 2 (Notary Public's certification dated Nov. 1, 2013).

[98] A reasonable juror could not conclude that Mrs. Hill "allowed" plaintiff to *enter* her home, when it is undisputed that Mrs. Hill was not expecting plaintiff, did not answer the door, and did not even see plaintiff until she was standing in the Hills' hallway.

When plaintiff presented Mrs. Hill's affidavit to Chairman Davis during the November 5th hearing, his "first reaction was that [the statements contained in it were] completely opposite" to the description of events previously related to him by Mrs. Hill during their telephone conversation on or about October 7, 2013.[99]  He added that Mrs. Hill had said to him that, even though she had known plaintiff "for a while," she had not spoken to her in "five or six years."[100]  For such reasons, Chairman Davis assigned little weight to the affidavit.[101]  Moreover, he believed the incident to be a serious one: "something we couldn't turn our attention away from. It was definitely a fireable offense according to our handbook.  You just couldn't let it go, so to speak."[102]

## T.    Friday, November 15, 2013

Ten days after the hearing before Chairman Davis, plaintiff chose not to wait for his decision on the evidence presented, and filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").    She alleged discrimination based upon her sex and perceived disability.[103]  She hand-delivered a

---

[99] Doc. no. 28-12 (Transcript of Feb. 3, 2014 Personnel Board Hearing: Davis Testimony), at 148-49 (alteration supplied).

[100] Id. at 149.

[101] Davis also surmised that, "[u]nder the circumstances, I almost felt like Mrs. Hill was probably pretty good people and didn't want to cause any trouble, and that she may have signed it to keep Mrs. Morgan out of any trouble." Id. (alteration supplied).

[102] Id. at 155.

[103] See doc. no. 36-1, at ECF 39 (EEOC Charge Filed Nov. 15, 2013). See also doc. no. 1

copy of the charge to both Chairman Davis and Lawrence County Attorney David Martin on the same day it was filed.[104]

## U. Tuesday, November 19, 2013

Chairman Davis hand-delivered a fifth letter to plaintiff on November 19, 2013. The copy filed in the record of this case states that the letter was "Drafted November 11, 2013," but not "Hand Delivered" until eight days later: "November 19, 2013."[105]

Laying aside the questionable veracity of the self-serving "Drafted" date — *i.e.*, November 11, 2013 was Veterans Day, a legal holiday in both Alabama and the United States, *and four days before plaintiff filed her EEOC Charge* — the letter clearly states that it was "Hand Delivered" to plaintiff on "November 19, 2013," *four days after her EEOC charge had been filed.*

The letter stated that Chairman Davis had changed his mind, and decided to downgrade the sanction for plaintiff's conduct from termination of employment for cause, to *suspension without pay* for "twenty (20) work days," beginning on the same date that termination was slated to have occurred (*i.e.*, November 5, 2013).

The letter also reiterated the fact that the County Commission had rescinded plaintiff's appointment as "Acting EMA Director" on October 8, 2013, and

---

(Complaint), ¶ 40; doc. no. 1-1 (Right to Sue Letters); doc. no. 5 (Answer), ¶ 40.

[104] *See id.* at ECF 38 (Letter Informing Chairman Davis of EEOC Charge).

[105] Doc. no. 28-15, at ECF 8 (alteration supplied).

reassigned her to her previous position of Deputy EMA Director. The full text of the letter reads as follows:

> This letter is a Notice of Suspension under Section 9.10 of the Lawrence County Personnel Handbook. I have considered both the evidence that you presented at the pre-disciplinary hearing and your long record of service with the Lawrence County Commission, and *I have decided not to terminate your employment at this time. Instead, I am imposing suspension without pay of twenty (20) work days, effective November 5, 2013*, based on my determination that you committed the following Group Two offenses:
>
> 9.6.21:  Conduct Unbecoming an Employee
>
> 9.6.30:  Other Unacceptable Conduct
>
> These violations are based on your conduct on October 5 [*sic*],[106] when you entered a private home in the middle of the night while supposedly responding to an emergency call, and October 6, when you called 911 making a false allegation that phone lines had been cut. Your conduct on both those occasions in interacting with members of the public and with law enforcement officials was unacceptable. That these incidents did not result in more harm being done does not change the fact that you showed very poor judgment on both of these occasions, which damaged critical relationships and raised very serious questions regarding your leadership abilities.
>
> This suspension is also based on your commission of the following Group One and Two offenses:
>
> 9.4.4:  Work Interference
>
> 9.4.13:  Other Conduct
>
> 9.6.19:  Abusive Conduct

---

[106] *See supra* note 96.

43

These violations are also based on your behavior at the meeting of the Lawrence County Commission on September 30, 2013, and on the manner in which you have handled an apparent dispute between yourself and Ms. Galbreath, both in the September 30 meeting an [*sic*] on other occasions. Your behavior has been unprofessional and has needlessly interfered with Commission operations.

The modification of the proposed discipline should in no way be taken as a signal that I do not consider these incidents to be very serious in nature. *While these incidents warrant termination under the Handbook, because of your long term employment with Lawrence County I have chosen to suspend you without pay.* You have the right to request, in writing, within ten (10) calendar days an appeal in front of the Lawrence County Appeals Board as to your suspension without pay in accordance with Chapter Ten of the Personnel Handbook.

Further, this letter serves as a notification that your temporary assignment as Interim [or "Acting"] EMA Director was canceled by the Commission's appointment of a new Interim EMA Director, which occurred on October 8, 2013. *You have therefore been reassigned to the position of deputy EMA director. This reassignment is not a disciplinary action; therefore, you do not have the right to appeal this reassignment.*

Doc. no. 28-15, at ECF 8 (Nov. 19, 2013 Letter) (emphasis, footnote, and alterations supplied).

## V.   Monday, November 25, 2013

Plaintiff submitted a letter to the Lawrence County Appeals Board on November 25, 2013, noticing her "appeal of the decision of Lawrence County Commissioner Prentis Davis suspending [her] without pay for 20 work days."[107]

---

[107] *See* doc. no. 36-1, at ECF 40 (Nov. 25, 2013 Letter) (alteration supplied).

44

W.    **Tuesday, November 26, 2013**

The minutes of the Commission meeting held on November 26, 2013, record

the following actions:

> EXECUTIVE SESSION:
> Mr. Martin [the County Attorney] stated that the executive session was
> *to discuss potential litigation.* Commissioner Jones made a motion to
> go into executive session. Commissioner Nelson gave a second and all
> Commissioners voted aye.
>
> Commissioner Jones made a motion to come back into regular session.
> Commissioner Nelson gave a second and all Commissioners voted aye.
>
> EMA CLASSIFICATION:
> *Commissioner Burch made a motion to adopt the Resolution*
> *Eliminating the Position of Deputy EMA Director.* Commissioner
> Hargrove gave a second. Commissioner Jones voted no with all other
> Commissioners voting yes. Motion passed.

Doc. no. 37-1, at ECF 44 (Nov. 26, 2013 Minutes) (alteration and emphasis supplied).

The resolution thus adopted reads as follows:

> ### RESOLUTION ELIMINATING POSITION OF
> ### DEPUTY EMA DIRECTOR
> Whereas, the Lawrence County Commission received a July 18,
> 2013 letter from the three staff members of the Lawrence County
> Emergency Management Agency stating that two employees could
> adequately perform the duties necessary for the operation of the
> Lawrence County EMA and recommending, in part, that another
> employee not be hired after the retirement of EMA Director Hillard
> Frost [*see* Part III.B., *supra*];
>
> Whereas, at the time of the July 18, 2013 letter the members of the
> Lawrence County Commission were considering eliminating one of the

three EMA positions as a cost-saving measure and the Commission has continued to consider the matter since that time;

Whereas, the Lawrence County Commission recently reduced the salary of the EMA Director position as a further cost-saving measure [*see* Part III.P., *supra*];

Whereas, the job titles of the three Lawrence County EMA positions are EMA Director, EMA Deputy Director and TVA Planner;

Whereas, the TVA Planner position is required by virtue of the Lawrence County Commission's agreement or grant assurances with TVA and a 100 [*sic*] percent of the salary of the TVA Planner position is funded by TVA; as a result, no cost savings would be realized if the position was eliminated;

Whereas, it is required by law that each county in the State shall have an EMA Director and, further, it is necessary for the efficient operation of the Lawrence County EMA that the position of EMA Director should remain as one of the two staff positions of the Lawrence County EMA; and

Whereas, in view of the above, the only remaining staff position that the Lawrence County Commission can eliminate which will not have a negative impact on the operation of the Lawrence County EMA is the position of Deputy Director;

NOW, THEREFORE, BE IT RESOLVED that the position of Deputy Director of the Lawrence County Emergency Management Agency is eliminated, *effective December 3, 2013.*

ADOPTED this 26th day of November, 2013.

*Id.* at ECF 38 (alterations and emphasis supplied); *see also* doc. no. 28-16, at ECF 3 (same).

County Attorney David Martin sent a letter to plaintiff on the same day that the Commission adopted the foregoing resolution, informing her that her employment would end as of December 3rd: *i.e., the same date on which plaintiff's twenty-work-day suspension without pay expired.*[108] His letter read as follows:

> The Lawrence County Commission voted today, November 26, 2013, to eliminate the position of Deputy EMA Director effective December 3, 2013. *Your employment with the Lawrence County Commission will, accordingly, end as of that date.*
>
> *This action is not disciplinary* and is not in any way a reflection on your job performance or personal conduct, *but rather is being done as part of a general cost reduction program that has unfortunately been necessitated by current economic conditions.*
>
> There are currently no vacant positions of equal or lower grade in the classified or part-time service either in your department or any position controlled by the Commission for which you are qualified; however, you are eligible for rehire and will be placed on the reappointment re-employment eligibility list.
>
> Thank you for your service to Lawrence County.

Doc. no. 28-16, at ECF 5 (Nov. 26, 2013 Letter) (emphasis supplied).

## X.   Monday, December 23, 2013

Plaintiff was included in each round of the interviews for applicants for the

---

[108] If only the National Holidays of November 11, 2013 (Veterans Day) and November 28, 2013 (Thanksgiving) are subtracted from plaintiff's twenty-work-day suspension, that sanction would have expired on Wednesday, December 4, 2013. *Assuming, however, that — as is normally the case in national, state, and local governments — the day after Thanksgiving* (Friday, Nov. 29, 2013) *also was a holiday for Lawrence County's employees, then* "twenty (20) *work days*" would *have expired on Tuesday, December 3, 2013.*

vacant EMA Director position,[109] but the Commission ultimately selected an external candidate named Johnny Cantrell on Monday, December 23, 2013: twenty days after the termination of plaintiff's employment.[110]

The official description of the EMA Director position states that its occupant must possess the "[a]bility to analyze situations and adopt quick, effective, *reasonable* courses of action," and sufficient "[*s*]*tamina and endurance to work under stress for several days at a time in emergency situations*."[111] The Lawrence County Personnel Handbook states that "[j]obs shall be filled, whenever possible, with the most qualified eligible applicants,"[112] and that, "[n]ormally, *preference will be given to qualified regular status classified employees*; however, an appointing authority will have the right to select an applicant who is *not an employee*, if that person is considered to be the *best qualified*."[113]

Even though the Commission had voted on October 22, 2013 to reduce the pay classification for the incoming EMA Director from a class XIV to a class XI (a $28,000 reduction), Cantrell received pay raises exceeding the aggregate amount of

---

[109] *See* doc. no. 28-3 (Davis Deposition), at 50.

[110] *See* doc. no. 28-2 (Burch Deposition), at 164.

[111] Doc. no. 28-17 (EMA Director Job Description), at ECF 4-5 (alterations and emphasis supplied). The court notes that plaintiff complained that she was "getting tired," two hours into her deposition. *See* doc. no. 28-1, at 48.

[112] Doc. no. 34-1 (Personnel Handbook), at ECF 5 (alteration supplied).

[113] *Id.* at ECF 18, § 4.1.4 (alteration and emphasis supplied).

$10,000 within the first year following his date of hire.[114]

## Y.    The Relative Qualifications of Plaintiff and Johnny Cantrell

Plaintiff contends that she was "more qualified" for the Director position than Johnny Cantrell.[115] "[N]umerous" letters of recommendation had been submitted on her behalf during the interview process, including letters from Hillard Frost and

---

[114] *See* doc. no. 28-2 (Burch Deposition), at 166-67 (indicating that Cantrell's starting salary, as of Dec. 23, 2013, was $41,849.60, and that amount was increased to $52,000). The Commission claims that it awarded those raises in order to compensate Cantrell for performing duties above and beyond his role as EMA Director. Commissioner Bobby Burch explained the considerations as follows:

> See, Johnny came in, and Johnny had a lot of IT background. Johnny was able to go to the revenue commission and the sheriff's department. He's been around to the commissioner's office. He's gone around — he's been able to save tons of money networking our phones together by changing over our ITT [*sic*]. He's been doing all this computer work.
>
> We . . . can't afford an IT person. . . . So now we do have an IT person, somebody that's qualified and that's working.
>
> He's not always in the office. . . . but he's a phone call away. But, you know, EMA has to be there when things are bad. Sometimes you go through days when there's nice weather and there's no threats and there's no warnings, and they have all their stuff together. Instead of just sitting down there, you've got an employee that can go around and can do all these things. . . .
>
> And these other department heads have called me and said thank you for letting him come in and do these things, volunteering. And he has already saved tons of money, just at the commission alone, being able to bundle and network our phone packages and our cable and our DSL. And he's done that for others.
>
> Plus, in addition, we found out that his qualification or his certification, or whatever it is, we get reimbursed $11,000 more than what Hillard Frost brought.

Doc. no. 28-2 (Burch Deposition), at 168-69 (ellipses supplied).

[115] *See* doc. no. 32 (Plaintiff's Response in Opposition to Summary Judgment), at 24-25.

49

"other EMA Directors around the state."[116]  She also had:  logged 250 hours of "Advance Level Emergency Management Re-Certification,"[117] training that Cantrell did not match; served as Deputy Director of the Lawrence County EMA for *nine years*, whereas Cantrell served as Deputy Director of the Morgan County EMA for only *three months*;[118] and, established relationships with "the mayors and agencies [with whom and which the EMA worked] in the county."[119]

Commissioner Burch agreed that plaintiff was more "certified" than Cantrell, but argued that she was not more "qualified."[120]  Cantrell had served in the United States Air Force for nearly four years as a "Security Specialist,"[121] and also had worked for the Morgan County EMA since 2002 — a year longer than plaintiff's tenure in the Lawrence County EMA office.[122]  He had completed a number of courses of instruction offered by the Federal Emergency Management Agency,[123] as

---

[116] Doc. no. 28-3 (Davis Deposition), at 52 (alteration supplied).

[117] *See* doc. no. 34-2, at ECF 3 (Brenda Morgan Resume).

[118] *See* doc. no. 28-2 (Burch Deposition), at 165.

[119] Doc. no. 28-1 (Morgan Deposition), at 88-89 (alteration supplied).

[120] Doc. no. 28-2 (Burch Deposition), at 127.

[121] *See* doc. no. 28-7 (Cantrell Collective Ex. – Part 1), at ECF 2, 4; doc. no. 28-8 (Cantrell Collective Ex. – Part 2), at ECF 5.

[122] Following a tornado that occurred on Feb. 6, 2007, but while still employed by the Morgan County EMA, Cantrell assisted the Lawrence County EMA in its relief efforts. *See* doc. no. 28-7 (Cantrell Collective Ex. – Part 1), at ECF 49 (Lawrence County EMA log signed by Tammy Vinson showing that Cantrell contributed *eighty hours of work* to the relief effort).

[123] Cantrell completed each of the following courses offered by the Federal Emergency Management Agency ("FEMA"), among others: *Introduction to the Incident Command System* (doc. no. 28-7 (Cantrell Collective Ex. – Part 1), at ECF 6); *National Response Plan (NRP): an*

well as other organizations,[124] and had been certified by the Alabama Association of Emergency Managers in 2005 as an "Intermediate Level Emergency Manager," and in 2011 as an "Advanced Level Emergency Manager."[125] His interview was described as "impressive."[126]   According to Commissioner Bobby Burch, Cantrell "brought things out in the interview to me that I didn't realize.  He brought out things the EMA should be doing that we were not doing."[127]

Tammy Vinson testified that, even though plaintiff had entered the Hills' home uninvited, she continued to believe that plaintiff was "qualified" to serve as Acting

---

*Introduction* (*id.* at ECF 8); *Decision Making & Problem Solving* (*id.* at ECF 11); *The Role of Voluntary Agencies in Emergency Management* (*id.* at ECF 13); *Radiological Emergency Response* (*id.* at ECF 15); *Hazardous Materials for Medical Personnel* (*id.* at ECF 17); *National Incident Management System, an Introduction* (doc. no. 28-7 at ECF 19); *Emergency Program Manager: An Orientation to the Position* (*id.* at ECF 21); *Emergency Preparedness, USA* (*id.* at ECF 23); *An Introduction to Hazardous Materials* (*id.* at ECF 27); *Building for the Earthquakes of Tomorrow* (*id.* at ECF 29); *An Orientation to Community Disaster Exercises* (*id.* at ECF 31); *Animals in Disaster, Awareness and Preparedness* (doc. no. 28-7 at ECF 37); *Animals in Disaster, Community Planning* (*id.* at ECF 39); *Are You Ready? An In-Depth Guide to Citizen Preparedness* (doc. no. 28-9 (Cantrell Collective Ex. – Part 3), at ECF 8); *Household Hazardous Materials: A Guide for Citizens* (*id.* at ECF 10); *An Introduction to Exercises* (*id.* at ECF 11); *Exercise Design* (*id.* at ECF 14); *Principles of Emergency Management* (*id.* at ECF 15); *Active Shooter: What You Can Do* (*id.* at ECF 24); *Guide to Points of Distribution* (doc. no. 28-9 at ECF 27); and *Developing & Managing Volunteers* (*id.* at ECF 49).

[124] Cantrell attended the "Bomb-Making Materials Awareness Program" hosted by Auburn University in Montgomery, and the "Storm Spotter Training" course hosted by the U.S. Department of Commerce's National Weather Service. *See* doc. no. 28-8 (Cantrell Collective Ex. – Part 2), at ECF 12 and 23.

[125] *See* doc. no. 28-8 (Cantrell Collective Ex. – Part 2), at ECF 6-7.

[126] *See* doc. no. 28-2 (Burch Deposition), at 110, 165, 167-69, 189-90; doc. nos. 28-9 through 28-11 (Cantrell Collective Ex. — Parts 1 through 3).

[127] Doc. no. 28-2 (Burch Deposition), at 122.

51

EMA Director.[128]  Vinson based her assessment upon the facts *as plaintiff recounted
them, however — i.e.*, that the Hills had known her for decades, and Mrs. Hill was not
bothered by plaintiff's unauthorized and unannounced entry into her home.  Thus,
Vinson added, "if the incident . . . happened like [the Hill family] said it did, [then]
it *was* a concern."[129]

Tricia Galbreath testified in her affidavit that she had heard Chairman Davis
and Commissioner Burch describe plaintiff as "crazy," and state that she had a
"mental problem."[130]  Galbreath also testified that Davis and Burch had stated their
opinion that plaintiff "would be making too much money as EMA director,"[131] and
blamed plaintiff "for the County not receiving CDBG [*i.e.*, Community Development
Block Grant] money earlier [that] year."[132]

On the other hand, Commission Chairman Prentis Davis stated that the
sanctions he imposed upon plaintiff were not based upon a perceived "disability," but

---

[128] *See* doc. no. 36-2 (Vinson Deposition), at 16-17.

[129] *Id.* at 15 (ellipsis, alterations, and emphasis supplied).

[130] Doc. no. 39-3 (Galbreath Affidavit), ¶ 11.

[131] *See id.* ¶ 9.  *See also* doc. no. 28-1 (Morgan Deposition), at 43 (stating that the Commission's motive for "getting rid of her" was to prevent her from earning the Director's salary).

[132] *See* doc. no. 39-3 (Galbreath Affidavit), ¶ 10 (alterations supplied).  CDBG is a program run by the United States Department of Housing and Urban Development. One designated "program area" for use of CDBG funding is "Disaster Recovery Assistance," under which the Department of Housing and Urban Development "provides flexible grants to help cities, counties, and States recover    from    Presidentially    declared    disasters." http://portal.hud.gov/hudportal/HUD?src=/program_offices/comm_planning/communitydevelop ment/programs (last accessed Mar. 29, 2016).

instead upon her "poor judgment":

> Immediately after the events of the week of September 30, 2013,
> I was initially concerned that Ms. Morgan's erratic behavior might have
> been caused by a health issue, particularly because she had stated during
> that following week that she was having trouble with high blood
> pressure and exhaustion. It became clear to me, however, that these
> events were *just a matter of poor judgment on Ms. Morgan's part. The
> fact that she has never seemed to understand exactly how badly entering
> a house unannounced in the middle of the night could have turned out
> for her only reinforces to me that her misconduct was a result of
> deliberate choices made by her.*

Doc. no. 28-18 (Davis Declaration), ¶ 3 (emphasis supplied). He testified during

plaintiff's February 3, 2014 Personnel Board Hearing that he also was concerned

about the County's exposure to liability if plaintiff continued to engage in such

behavior while working for the EMA.[133]

## IV. DISABILITY DISCRIMINATION CLAIM

The Americans with Disabilities Act of 1990 provides: "No covered entity

shall discriminate against a qualified individual on the basis of disability in regard to

job application procedures, the hiring, advancement, or discharge of employees,

employee compensation, job training, and other terms, conditions, and privileges of

employment." *See* 42 U.S.C. § 12112(a). Plaintiff alleges that the Lawrence County

Commission violated that statutory prohibition by: (a) suspending her without pay

---

[133] Doc. no. 28-12 (Transcript of Feb. 3, 2014 Personnel Board Hearing: Davis Testimony), at 155.

for twenty work days; (b) demoting her to the position of Deputy EMA Director; (c) terminating her employment by eliminating the Deputy EMA Director position; and (d) failing to hire her as permanent EMA Director. She contends that each of those employment actions was based upon the Commissioners' perception of her as "disabled."[134]

Plaintiff does not present direct evidence that the Commissioners regarded her as "disabled." In the absence of such evidence, the Eleventh Circuit employs the same burden-shifting framework originally developed to analyze the sufficiency of circumstantial evidence offered in support of Title VII employment discrimination claims in ADA cases. *See, e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007); *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001); *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000); *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999). The first step of that now familiar framework requires a plaintiff to make out a case sufficient to withstand a motion for summary judgment (or a motion for judgment as a matter of law) — *i.e.*, "a *prima facie* case." A *prima facie* case under the ADA requires a plaintiff to establish at least three elements: (1) that she either had, or was regarded

---

[134] *See* doc. no. 32 (Plaintiff's Response in Opposition to Summary Judgment), at 15, 21, 25.

by the employer as having, a "disability" within the meaning of that term as defined

in the Act; (2) that she is "a qualified individual with a disability," meaning that she

can perform the essential functions of the employment position she held or sought,

with or without reasonable accommodations being made by the employer;[135] and (3)

that she suffered an adverse employment action because of her disability.[136] *See, e.g.*,

*Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). If the plaintiff

makes such a showing, that gives rise to a presumption that the employer intended to

discriminate on the basis of the plaintiff's disability.

Once such a presumption is raised, the burden then shifts to the employer to

articulate some legitimate, nondiscriminatory reason for the adverse employment

action(s) complained of. If the employer meets its burden of production, the

presumption of discrimination raised by the plaintiff's *prima facie* case is rebutted,

and drops from the case. At that point, the burden shifts back to the plaintiff to show

---

[135] *See* 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"); *see also* 29 C.F.R. § 1630.2(m) ("Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position.").

[136] There actually is a fourth element, implicit in the interstice between the second and third: *i.e.*, "a plaintiff must demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled." *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 910 (11th Cir. 1996) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996) (*per curiam*)).

that the employer's stated reason was a pretext for discrimination. The inquiry into pretext requires the court to determine, in view of all the evidence, whether the plaintiff has cast sufficient doubt upon the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered reasons were not what actually motivated its conduct. *Cf., e.g.*, *Crawford v. Carroll*, 529 F.3d 961, 975-76 (11th Cir. 2008) (Title VII case).

With regard to the first *prima facie* element, the ADA defines the term "disability" in three ways — that is, as including any individual who:

> (i) has a physical or mental impairment which substantially limits one or more of such person's *major life activities*; [or]
>
> (ii) has a record of such an impairment; or
>
> (iii) *is regarded as having such an impairment.*

42 U.S.C. § 12102(1) (alteration and emphasis supplied). The term "major life activities" includes, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, *and working*." 42 U.S.C. § 12102(2)(A) (emphasis supplied).

Defendant contends that plaintiff "is not disabled," and that she "cannot present substantial evidence that she was ever considered to be [*i.e.*, was *regarded as*

56

being] disabled by the Defendants [*sic*]."[137]  In response, plaintiff argues that, even

though she admittedly did not have an *actual* "disability," the "evidence shows that

both Commissioner's [*sic*] Burch and Davis perceived Plaintiff as having a mental

disability at the time that Plaintiff was disciplined in the fall of 2013."[138]  The only

evidence that plaintiff offers in support of that contention, however, is Chairman

Davis's statement that he was concerned that her erratic behavior was the result of a

"health issue,"[139] and the statements of Chairman Davis and Commissioner Burch that

---

[137] Doc. no. 27 (Defendant's Brief in Support of Summary Judgment), at 14 (alteration supplied). EEOC regulations define a person who is "regarded as having an impairment" in terms of *the attitudes, perceptions, beliefs of — or treatment by — other persons*: *i.e.*, as (1) an individual who has a physical or mental impairment that does *not* substantially limit that person's major life activities, *but who is treated by his or her employer as having such a limitation*; or as (2) an individual who has a physical or mental impairment that substantially limits major life activities, *but only as a result of the attitudes of others toward such impairment*; or as (3) an individual who has no illness or malady defined by the EEOC as a physical or mental impairment, *but who is treated by his or her employer as having a substantially limiting impairment.* *See* 29 C.F.R. § 1630.2(*l*); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 192 (5th Cir. 1996).

[138] Doc. no. 32 (Plaintiff's Response in Opposition to Summary Judgment), § II.A., at 17 (arguing that defendant wrongfully discriminated against plaintiff when it disciplined her — *i.e.*, suspended her without pay for twenty work days — based upon the perception of *Commissioners Burch and Davis* that she had "a mental disability"). *See also id.*, § II.B.1., at 21 (arguing that defendant discriminated against plaintiff when it "failed to hire/promote Plaintiff to the position of EMA Director based on Plaintiff's perceived disability": *i.e.*, "In this case, as set forth above, Plaintiff has established that she was *perceived to have a disability*, that she was qualified, and that she was not hired as permanent EMA Director. Thus, she has established her prima facie case [under the ADA].") (emphasis and alteration supplied); *see also id.*, § II.C.1., at 26 (arguing that defendant discriminated against plaintiff when it "terminated" her employment — *i.e.*, eliminated the Deputy EMA Director position — based upon its perception of her as disabled: "Indeed, the evidence in this case demonstrates that *Commissioners Burch and Davis* both expressed that they thought Plaintiff was 'crazy' and had a 'mental problem' close to [the] time Plaintiff was terminated" (emphasis and alteration supplied)).

[139] *See, e.g.*, doc. no. 28-18 (Davis Declaration), ¶ 3.

she was "crazy," or had a "mental problem."[140]

The context in which those remarks were uttered is important. Chairman Davis testified in his affidavit that, "[i]mmediately after the events of the week of September 30, 2013," he "initially" believed that plaintiff's erratic behavior "might have been caused by a health issue."[141] The only health issues of which he indicated any awareness, however, and the only health issues of which plaintiff complained in this record, were "high blood pressure" and "exhaustion."[142]

Chairman Davis testified that it soon became "clear" that plaintiff's actions were not caused by a "health issue," but were, instead, the result of poor judgment;[143] and, the "poor judgment demonstrated by [plaintiff] . . . raised very serious concerns regarding her ability to do the job."[144]

Even if Chairman Davis believed that plaintiff's behavior was caused by her health issues of high blood pressure and exhaustion, plaintiff's own testimony undercuts the probative value of that evidence. Plaintiff testified that she only began

---

[140] *See* doc. no. 32 (Plaintiff's Response in Opposition to Summary Judgment), at 17, 21, 26; doc. no. 39-3 (Galbreath Affidavit), ¶ 11.

[141] Doc. no. 28-18 (Davis Declaration), ¶ 3 (alteration supplied).

[142] *Id.*

[143] *Id.* ¶ 3. His affidavit also states that he has never considered plaintiff to be disabled. *Id.* ¶ 4.

[144] *Id.* ¶ 5 (alteration and ellipsis supplied). *See Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir. 1999) (citing *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1993)) ("[A]n employer's perception that an employee cannot perform a particular task safely" does not "establish that the employer regarded the employee as disabled.") (alteration supplied).

to experience those conditions after misleading information was published in *The Decatur Daily* on September 28, 2013: *i.e.*, just five days before the bizarre events that occurred during the first week of October, 2013.[145] The Eleventh Circuit has stated that a "severe limitation that is *short term* and *temporary* is not evidence of a disability." *Garrett v. University of Alabama at Birmingham Board of Trustees*, 507 F.3d 1306, 1315 (11th Cir. 2007) (emphasis supplied); *see also Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir. 1999) (holding that, in order to "establish that an employer regarded an employee as 'disabled' and thus covered by [either] the Rehabilitation Act [or ADA], a plaintiff must introduce substantial evidence that the employer regarded him as having a *permanent* or *long-term* impairment") (alterations and emphasis supplied).[146] *Cf. Washington v. UPS*, 567 F. App'x 749, 753-54 (11th Cir. 2014) (affirming the district court's holding that the plaintiff had failed to establish a *prima facie* case, even though she had argued that the defendants perceived her as being "disabled by stress," because she "did not offer any evidence that the

---

[145] *See* doc. no. 28-1 (Morgan Deposition), at 58-59 (Plaintiff testified that, because of the *Decatur Daily* article, she "had had very little sleep, [was] very stressed, [and] agitated to the point where [she] did not want to be at the office because [she] did not feel like [herself]") (alterations supplied); *id.* at 64 ("I had not taken blood pressure pills for months until that week [*i.e.*, the week the *Decatur Daily* article was published].") (alteration supplied).

[146] "Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases . . . ." *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) (citing 29 U.S.C. § 794(d)) (ellipsis supplied, footnote omitted); *see also Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 n.2 (11th Cir. 1997). Thus, "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and *vice versa*." *Cash*, 231 F.3d at 1305 n.2 (citing *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 n.2 (11th Cir. 1996)) (alteration supplied).

decisionmakers considered her to be disabled such that she was substantially limited in major activities") (citing 29 C.F.R. § 1630.2(l) (2007)).

The Eleventh Circuit also has held that exhaustion and high blood pressure, without more, are not conditions that substantially impair a person's ability to perform major life activities, such as working. *See, e.g., Garrett*, 507 F.3d at 1314-15 (Rehabilitation Act plaintiff's evidence that she suffered from fatigue and frequently "collapse[d] because of exhaustion when she returned home from work" failed to raise an issue of triable fact that she was disabled) (alteration supplied); *Swain v. Hillsborough County School Board*, 146 F.3d 855, 856 n.1, 858 (11th Cir. 1998) (ADA plaintiff who suffered from urinary incontinence and high blood pressure was "not an individual with a disability as defined by the ADA"). Thus, plaintiff cannot establish that she was regarded as having a "disability" based upon Chairman Davis's reference to her as having a "health issue."

Plaintiff also cannot rest her *prima facie* case upon the statements of Chairman Davis and Commissioner Burch that she had a "mental problem," or was "crazy." Plaintiff has presented no evidence (and the record in this case would not support a finding) that those remarks pertained to any *cognitive* or *intellectual* deficiency. Rather, the evidence before this court compels a conclusion that the remarks only reflected the two Commissioners' perception of plaintiff as being paranoid, unable

to peacefully coexist with other County employees, disrespectful, or otherwise disgruntled. The Eleventh Circuit has stated the following regarding workplace comments of that nature:

> To state a case of unlawful discrimination under the ADA, a plaintiff must first prove he has a disability as defined by the Act. *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 910 (11th Cir. 1996) . . . . Under [42 U.S.C. § 12102(2)(C)], an individual is deemed to be disabled if he is regarded as having a mental impairment that substantially limits one or more of his major life activities. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1327 (11th Cir. 1998).
>
> [The plaintiff] failed to present any evidence from which a rational juror could find he was regarded as having a mental impairment. [The plaintiff] points to evidence which shows other officers regarded him as "paranoid," "disgruntled," "oppositional," "difficult to interact with," "unusual," "suspicious," "threatening," and "distrustful." These characterizations of [the plaintiff's] behavior merely show he had serious personality conflicts with members of his department. Such conflicts do not rise to the level of a mental impairment under the ADA. *See Stewart v. County of Brown*, 86 F.3d 107, 111 (7th Cir. 1996) (holding that an excitable, emotionally imbalanced individual is not disabled under the ADA). We affirm the district court's grant of summary judgment in favor of the City under § 12112(a).

*Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) (alterations supplied).

The decision of the Middle District of Florida in *Mickens v. Polk County School Board*, 430 F. Supp. 2d 1265 (M.D. Fla. 2007), is similar, and, persuasive:

> [T]he [defendant's] characterizations of [the plaintiff] as "really upset," "insubordinate," "volatile," "disrespectful," "confrontational,"

"combative," "defensive," "agitated," "irrational," "loud," "irate,"
"angry," "unprofessional," "unhappy," "threatening," "unpredictable,"
and "difficult," including testimony as to [the plaintiff's]
"uncharacteristic behavior" and his tendency to "fly off the handle,"
demonstrate (rather persuasively) [the plaintiff's] ongoing conflicts with
his supervisors and colleagues in the workplace.  As a matter of law,
"such conflicts do not rise to the level of a mental impairment under the
ADA."

*Id.* at 1274 (quoting *Watson*, 177 F.3d at 935) (alterations supplied).  *See also, e.g.*,

*Schlegelmilch v. City of Sarasota Police Dept.*, No. 8:06CV139T27MAP, 2006 WL

2246147, at *9 (M.D. Fla. Aug. 3, 2006) ("Plaintiff's allegation concerning his

perceived disability, namely that everyone regarded him as 'crazy,' falls short of Rule

8's liberal pleading standard.  Specifically, Plaintiff fails to allege a perceived

disability that 'substantially limit[s] one or more of [Plaintiff's] major life activities.'

*See* 42 U.S.C. § 12102(2).") (alterations in original); *Crawford v. AT&T*, 177 F. Supp.

2d 1293, 1300 (N.D. Ga. 2000) ("The only evidence Plaintiff cites as evidence that

CWA 'regarded' Plaintiff as having a substantially limiting disability is an alleged

statement made by Dwayne Gray, . . . that Plaintiff was 'crazy.'  This statement does

nothing to show Mr. Gray or CWA regarded Plaintiff as suffering from an impairment

which limited his working ability.") (ellipsis supplied).

Finally, as this court observed in note 38, *supra*, two Commissioners do not

constitute a governing majority.  The Lawrence County Commission consists of five

members, and plaintiff has presented no evidence that any of the three remaining members of that governmental body entertained such opinions, much less uttered remarks similar to those attributed to Chairman Davis and Commissioner Burch. In short, this court finds that plaintiff cannot prove that she was regarded as having a "disability," as that term is defined by the ADA, merely by presenting evidence that two of the five Commissioners made comments that she suffered from a "health issue," or that she had a "mental problem," or was "crazy."

Accordingly, plaintiff has not established a *prima facie* case of disability discrimination, and the Commission is entitled to summary judgment on her ADA claim.

## V. **TITLE VII GENDER DISCRIMINATION CLAIM**

Plaintiff also alleges that the Lawrence County Commission discriminated against her on the basis of her sex: when she was suspended without pay for twenty work days; when she was demoted from Acting EMA Director to her former position of Deputy EMA Director; when her employment was terminated by the decision to eliminate the Deputy EMA Director position; and, when she was not selected to replace Hillard Frost as permanent EMA Director.[147]

On any Title VII claim, the plaintiff "bears the ultimate burden of proving

---

[147] *See* doc. no. 32 (Plaintiff's Response in Opposition to Summary Judgment), at 15, 21, 25.

discriminatory treatment by a preponderance of the evidence." *Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008) (internal quotation marks omitted). To do so, the plaintiff must present either direct or circumstantial evidence of an intent to discriminate on the basis of plaintiff's gender. Again, however, plaintiff has not presented any direct evidence of an intent to discriminate on the basis of her sex. Consequently, each of her claims must be viewed through the familiar *McDonnell Douglas* burden-shifting analytical framework. *See, e.g., Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir. 1998) (observing that "a Title VII plaintiff cannot succeed in proving that she was intentionally discriminated against if she does not establish a prima facie case of discrimination") (Tjoflat, J., plurality opinion).

## A.    Disparate Disciplinary Treatment

In order to establish a *prima facie* case of disparate disciplinary treatment under Title VII of the Civil Rights Act of 1964, a plaintiff must show:  (1) that she is a member of a class of persons protected by the Act (*e.g.*, a female); (2) that she engaged, either disputedly or admittedly, in misconduct similar to that of a similarly situated co-employee outside the protected class (*e.g.*, a male); and (3) despite such similarities, the male co-employee was not disciplined in the same manner as plaintiff (*i.e.*, suspended without pay for twenty work days). *See, e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000); *Lathem v. Department of Children*

64

*and Youth Services*, 172 F.3d 786, 792 (11th Cir. 1999); *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989).

Plaintiff has not identified a male employee of Lawrence County who engaged in conduct similar to that which formed the basis for her suspension without pay for twenty work-days, but who was subjected to less severe disciplinary measures. "Absent some other similarly situated but differently disciplined worker, there can be no disparate treatment." *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000).

Plaintiff attempts to avoid the requirement of producing a comparator by relying upon the Eleventh Circuit's opinion in *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011).[148]  Upon initial reading, the *Smith* opinion appears to support plaintiff's reliance upon it.  The pertinent portion of the opinion held that

> establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. *Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case.*
>
> Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (declaring that, in cases where a plaintiff cannot establish a prima facie case, summary judgment only will be "appropriate where no other evidence of discrimination is present." (citations omitted)); *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011) ("To avoid summary judgment . . . the plaintiff must produce

---

[148] *See* doc. no. 32 (Plaintiff's Response in Opposition to Summary Judgment), at 15-16, 18.

sufficient evidence, either direct or circumstantial, to create a triable question of intentional discrimination in the employer's decision."). *A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker*." *Silverman*, 637 F.3d at 734 (citations and internal quotation marks omitted); *see also James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000) ("[T]he way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove — particularly discrimination.").

*Smith*, 644 F.3d at 1328 (emphasis supplied, footnote omitted, alteration in original).

Despite those statements, the *Smith* opinion does not provide an easy bypass around the *McDonnell Douglas* analytical framework for plaintiffs who allege a Title VII disparate disciplinary treatment claim, and who cannot identify a comparator who engaged in similar conduct, but was subjected to less severe disciplinary measures. Instead, close attention to the underlying facts of the *Smith* case illustrates that its holding applies in a more limited scope.

The plaintiff in *Smith* was a Caucasian male who had worked as a supervisor at the Lockheed-Martin Aeronautics Company plant in Marietta, Georgia. He had received a "racially insensitive 'joke' email" entitled "Top Ten Reasons Why There are No Black NASCAR Drivers" (the "NASCAR email"),[149] and had forwarded the

---

[149] For example, the email stated that there are no blacks in NASCAR racing because a "[p]istol won't stay under the front seat," and because there is "[n]o passenger seat for the ho." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1324 (11th Cir. 2011) (alterations in original).

email to his supervisor without reporting it to the company's Human Resources Department.  Following an investigation, Lockheed-Martin fired the plaintiff for violating the company's zero tolerance policy prohibiting workplace discrimination and harassment.[150]  The plaintiff then commenced a "reverse discrimination" suit under Title VII and § 1981, alleging that his former employer had discriminated against him because of his race when terminating his employment.  In support of that claim, the plaintiff presented evidence of two African-American non-supervisory employees at the Marietta plant who also had violated Lockheed's zero tolerance policy by transmitting "racially insensitive" emails entitled "How to Dance Like a White Guy" (the "White Guy Video"),[151] but who had only been *suspended* for their

---

[150] Lockheed's "zero tolerance policy" was designed to provide notice to employees that the company's Human Resources department would discipline anyone who, while in the workplace,

> engages in an act of discriminatory "harassment based on a legally protected status such as race . . . when it has the effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment."  This includes using Lockheed email accounts "in ways that are disruptive, abusive, obscene, or degrading, or offensive to others," such as the distribution or "*transmission of ethnic slurs or racial comments*."

*Smith*, 644 F.3d at 1323 (emphasis in original, footnotes omitted).  One of the omitted footnotes stated that: "Discriminatory harassment is defined under the zero tolerance policy to include an employee's use of 'racial slurs, ethnic jokes, sexual or lewd jokes, negative or derogatory stereotypes, names, or labels that a reasonable person would find offensive.'" *Id.* at 1323 n.2.

[151] The White Guy Video "made various derogatory references about whites, referring to them as 'cracker[s],' 'white[ies],' 'honk[ies],' and 'homo[s].'" *Id.* at 1338 (alterations in original, footnote omitted).  The omitted footnote observed that "[t]he video also contained sexually explicit references to masturbation and female genitalia and portrayed Adolf Hitler." *Id.* at 1338 n.63.  It also is significant to note that Lockheed did not argue that there was "any material difference in the level of racial offensiveness between the White Guy Video and the NASCAR email." *Id.* at 1338 n.62.

conduct, as opposed to *terminated*. The district court, however, found that the non-supervisory African-American employees were not "similarly situated" to the plaintiff, who had worked as a supervisor, and entered summary judgment in favor of Lockheed-Martin.

On appeal, Judge Tjoflat's opinion for the Eleventh Circuit panel[152] agreed with the district court that the plaintiff had not presented valid comparator evidence,[153] but nevertheless reversed the district court's grant of summary judgment, saying that the facts of the "reverse discrimination" claim lodged by the white plaintiff in *Smith* had to be viewed against the backdrop of a racially-motivated, workplace shooting that had occurred in 2003 at the Lockheed-Martin Aeronautics

---

[152] In addition to Judge Gerald Bard Tjoflat, the panel consisted of Judge Edward E. Carnes and Judge Thomas M. Reavley of the Fifth Circuit Court of Appeals, sitting by designation.

[153] Indeed, nowhere in the *Smith* Court's lengthy decision is there any reference to the Circuit's decision in *Maniccia v. Brown*, 171 F.3d 1364 (11th Cir. 1999), holding that, when deciding whether employees are "similarly situated comparators," district courts should "consider whether the employees are 'involved in or accused of the *same or similar conduct* and are disciplined in different ways.'" *Id.* at 1368 (quoting *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998) (in turn quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997)) (emphasis supplied).

> "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." [*Jones*, 137 F.3d at 1311] (internal quotations and citations omitted). We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.

*Maniccia*, 171 F.3d at 1368 (alteration supplied) (citing *Dartmouth Review v. 1369 Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.")).

Company plant in Meridian, Mississippi. The gunman in that incident was a white employee who had repeatedly harassed his black coworkers and publicized his white supremacist views while working at the Meridian plant. He shot and killed five coworkers and wounded eight others before taking his own life. *See id.* at 1329 & n.26. In the wake of that horrific incident, some groups, including national news media outlets and the plaintiffs in various civil suits brought by victims and the personal representatives of the estates of deceased victims, "began to blame the shootings on company HR officials, claiming that those officials knew of [the gunman's] racist propensities long before the shootings transpired, but did little to curb his harassing ways." *Id.* (alteration supplied).

> On the heels of several of the initial civil lawsuits, the EEOC, in July 2004, made similar allegations against Lockheed HR officials. Following an investigation into the Meridian shootings, the EEOC prepared a report that expressly faulted Lockheed's HR for having fostered a workplace environment in Meridian that was hostile to black employees. While the EEOC acknowledged that [the racist gunman], alone, had created a racially hostile work environment through his threatening comments to black coworkers, its investigation concluded that Lockheed had allowed this hostility to intensify by not adequately responding to these known race-based threats. Moreover, the EEOC suggested, such hostility toward black employees still festered over a year after the shootings, as HR had yet to remedy it.
>
> . . . .
>
> Then, in the spring of 2005, less than a year after the EEOC issued its report and while many of the civil cases remained ongoing,

> Lockheed learned that ABC News planned to produce a report commemorating the second anniversary of the Meridian shootings. The special report was to be aired on the network's investigatory-news magazine show, "Primetime Live."

*Id.* at 1330. Thus, facing civil liability and negative national publicity, the company's Human Resources Department began what could be described as a campaign of racial "overcompensation." That was especially apparent in the varying ways in which white, as opposed to black, employees were disciplined.

It was in the midst of that tense atmosphere that the white male supervisory plaintiff in *Smith* forwarded the racially insensitive "joke email" to his supervisor. *Id.* at 1324. Lockheed's HR department created a "matrix" to determine the appropriate disciplinary action for each employee who had transmitted the NASCAR email. *Id.* at 1336. That matrix notably "included a column reflecting each employee's race," in which the employer wrote the letter "W" to denote "white," or "B" to denote "black." *Id.* In May of 2005, the plaintiff was terminated for violating the company's "zero-tolerance policy" for discrimination. *Id.* *Four other white employees who held non-supervisory positions also were terminated for transmitting the NASCAR email. See id.* at 1332-33, 1341. A few months later, when the "White Guy Video" was transmitted by company employees, including several black non-supervisory employees, Lockheed's HR Department once again formulated a matrix

70

to determine the appropriate level of discipline. *Smith*, 644 F.3d at 1338-39. This time, however, the matrix "did not include a notation for employee race." *Id.* The employees who had forwarded the White Guy video were not terminated pursuant to Lockheed's "zero tolerance" policy, but were, instead, subjected to temporary suspensions. *Id.*

The Eleventh Circuit reversed the district court's entry of summary judgment in favor of Lockheed-Martin after determining that the distinction between *non-supervisory* and *supervisory* employees should not have prevented the plaintiff from surviving summary judgment when that distinction was viewed in conjunction with the substantial circumstantial evidence indicating that the employer had discriminated against the plaintiff because he was white. *Id.* at 1328. Specifically, the Eleventh Circuit opinion stated that the "great discrepancies in the punishments received by the white non-supervisors . . . in contrast to their black peers, yields a reasonable inference that, in the summer of 2005, [Lockheed's Head of HR] intentionally discriminated against them because they are white." *Smith*, 644 F.3d at 1343 (ellipsis and alteration supplied).

When the *Smith* opinion is viewed in context, therefore, it is clear that the "convincing mosaic of circumstantial evidence" that was present there is not present in this case. There is no evidence that the Lawrence County Commission engaged in

71

a pattern of disciplinary discrimination based upon an employee's gender, and

plaintiff has not identified (nor alleged that there were) *any* instances in which female

employees were disciplined more severely than male employees.  Accordingly, the

court concludes that this is not a case to which the narrow holding of *Smith* should

apply.

There is no other circumstantial evidence of gender-based discrimination in this

record.  Thus, plaintiff's failure to produce evidence of a comparator is fatal to her

claim of disparate disciplinary treatment based on the Commission's suspension of

her employment without pay for twenty work days. *See Smith*, 644 F.3d at 1327-28

("If the record contained no circumstantial evidence from which a jury could

otherwise infer that [the plaintiff] was fired because of his race, our discussion would

end here, and we would affirm the district court's judgment.") (alterations supplied,

footnotes omitted); *see also Abel*, 210 F.3d at 1339 ("Absent some other similarly

situated but differently disciplined worker, there can be no disparate treatment.").

**B.    Demotion to Position of Deputy EMA Director**

There are four *prima facie* elements to a claim that a plaintiff's demotion,

allegedly for work-related misconduct, violated Title VII.  The plaintiff must

demonstrate that:  she is a member of a class of persons protected by Title VII (in this

case, a female); the demotion was a "tangible" adverse employment action; she was

72

qualified to perform the duties of the job position from which she was demoted; and, finally, that she was *either* (a) replaced by a person outside her protected class, *or* (b) that similarly situated employees who were not members of her protected class engaged in nearly identical misconduct, but were not demoted. *See, e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000); *Lathem v. Department of Children and Youth Services*, 172 F.3d 786, 792 (11th Cir. 1999); *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 n.6 (11th Cir. 1998); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

Plaintiff can satisfy the first three elements of a *prima facie* case, but not the fourth. When plaintiff was demoted to her former position of Deputy EMA Director, she was replaced in the position of "Acting EMA Director" by another female: Tammy Vinson. Further, plaintiff has not produced evidence of any male comparator who engaged in conduct similar to that discussed in Parts III.G. through III.J. of this Opinion, *supra*, but was not demoted. Finally, as discussed in the immediately preceding Part of this Opinion, plaintiff has not presented a "convincing mosaic of circumstantial evidence" of gender discrimination, such that she is entitled to survive summary judgment under the narrow holding of *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011). Accordingly, plaintiff has failed to demonstrate a *prima facie* case of gender discrimination in the Commission's act of demoting her from

73

Acting EMA Director to her previous position of Deputy EMA Director.

## C. Termination by Elimination of the Deputy EMA Director Position

Generally speaking, "[a]n employee establishes a prima facie case of discrimination in termination when the employee shows (1) membership in a protected class, (2) qualification for the position held, (3) termination, and (4) replacement with a person outside the protected class." *Walker v. NationsBank, N.A.*, 53 F.3d 1548, 1556 (11th Cir. 1995) (citing *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1532 n.14 (11th Cir. 1987)) (alteration supplied).

However, in cases where the employee was discharged as part of a purported "reduction in force" — or, as in the present case, the position occupied by the plaintiff was eliminated — and the plaintiff was not replaced by any person, the plaintiff

> may establish a prima facie case of discrimination by (1) showing that [s]he was a member of a protected group and was adversely affected by an employment decision; (2) proving that [s]he was qualified for [her] own position or to assume another position at the time of the discharge; and (3) producing sufficient evidence from which a rational fact finder could conclude that [her] employer intended to discriminate against [her] in making the discharge decision.

*Standard v. A.B.E.L. Services*, 161 F.3d 1318, 1331 (11th Cir. 1998) (citing *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1208 (11th Cir. 1997)) (alterations supplied).

It is undisputed that plaintiff, a female, was a member of a class of persons

74

protected by Title VII. Defendant denies the second element, that plaintiff was qualified to serve as either Deputy Director or Director of the EMA office. Even so, numerous facts support plaintiff's qualifications: *e.g.*, (a) Hillard Frost, the incumbent Director who had worked with and supervised plaintiff for almost a decade, recommended that the Commission select her to succeed him as EMA Director; (b) Commissioner Mose Jones testified that plaintiff was "definitely qualified" to serve as EMA Director;[154] (c) plaintiff had served as Deputy Director for nine years,[155] and had effectively *performed the duties of* the EMA Director during the final three years of Hillard Frost's tenure;[156] (d) numerous letters recommending plaintiff's selection for the EMA Director position were submitted to the Commission by other EMA Directors around the State; (e) plaintiff had earned 250 hours of "Advance Level Emergency Management Re-Certification"; and (f) plaintiff had worked for the Commission for twenty-four years. In light of the foregoing, this court finds that plaintiff *was* "qualified" for the Deputy Director position.

With regard to the last *prima facie* element, however, plaintiff has presented no evidence from which a reasonable jury could conclude that the Commission intended to discriminate against her on the basis of her *gender* when it eliminated the

---

[154] Doc. no. 37-1 (Jones Deposition), at 26.

[155] *See* doc. no. 34-2 (Brenda Morgan Resume), at ECF 3.

[156] *See* doc. no. 28-2 (Burch Deposition), at 92 ("Everybody knew that Brenda has been doing Hillard's job for the last three years.").

Deputy EMA Director position.

As an initial matter, plaintiff's brief in opposition to summary judgment misleadingly states that: "(1) she was in a protected class as a female; (2) she was qualified to perform the job [of Deputy EMA Director]; and (3) she was terminated; and (4) *Cantrell, a male, took over her job as EMA Director*."[157]  Even though plaintiff never *officially* occupied the position of "EMA Director," she effectively performed many of Hillard Frost's duties as Director during the final three years of his tenure.[158]  She also served for a brief period as "Acting EMA Director."  Even so, when plaintiff was demoted on October 8, 2013 to her former position of Deputy EMA Director, it was *Tammy Vinson — not Johnny Cantrell* — who replaced her as Acting EMA Director.[159]  Cantrell was not hired as permanent EMA Director until December 23, 2013:  twenty days after the termination of plaintiff's employment by elimination of the Deputy EMA Director position.[160]  Stated differently, there was no direct transition of power over the EMA Director position — on paper, or in practice — from plaintiff to Cantrell.  Rather, the transition was *from* Frost *to* plaintiff *to*

---

[157] Doc. no. 32 (Plaintiff's Response in Opposition to Summary Judgment), at 26 (alteration and emphasis supplied).

[158] Doc. no. 28-2 (Burch Deposition), at 92.

[159] *See* doc. no. 28-5, at ECF 17 (Oct. 8, 2013 Minutes) (stating that Tammy Vinson had been "appointed as acting Director of Lawrence County Emergency Management Agency until further notice").

[160] *See* doc. no. 28-2 (Burch Deposition), at 164.

Vinson *to* Cantrell. Plaintiff, therefore, cannot establish that she was replaced by someone outside of her protected class.

Moreover, plaintiff does not allege that any of the Commissioners made any gender-related comments regarding the elimination of the Deputy EMA Director position. Finally, she does not allege that the position of Deputy Director subsequently was reinstated, and filled with a male candidate.

For all of the foregoing reasons, plaintiff cannot establish a *prima facie* case of gender discrimination when the Commission terminated her employment by eliminating the Deputy EMA Director position.

## D.   Failure to Hire Plaintiff as Permanent EMA Director

To establish a *prima facie* case of gender discrimination for failure to hire, plaintiff must show that: she is a female, a classification protected by Title VII; she applied for, and was qualified to fill, the position for which the defendant was accepting applications; despite her qualifications, she was not hired; and, after her rejection, the employer filled the position with a male, a person outside plaintiff's protected class. *See, e.g.*, *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 258-59 (1981); *McDonnell Douglas Corp.*, 411 U.S. at 802 (failure to hire based on plaintiff's race); *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1267, 1268 (11th Cir. 1999) (failure to hire based on white male applicant's race and gender); *Walker*, 158

F.3d at 1179 n.2, 1185-93 (explaining that a plaintiff need not introduce evidence of the relative qualification of the person hired instead of plaintiff as part of his *prima facie* case for failure to promote); *Crawford v. Western Electric Company, Inc.*, 614 F.2d 1300, 1315 (5th Cir. 1980).[161]

The only disputed element is plaintiff's qualification for the Director position. For the reasons outlined in the immediately preceding Part of this Opinion, the court finds that plaintiff was qualified to serve as permanent EMA Director. Therefore, she has established a *prima facie* case.

The defendant asserts two nondiscriminatory reasons for rejecting plaintiff's application, and selecting Johnny Cantrell instead: the Commission believed Cantrell was the most qualified candidate, because he held a college degree, possessed "more overall experience in the emergency management field than Plaintiff," had served in the United States Air Force, and articulated innovative ideas for improving the County's financial health during his interviews; and, plaintiff's behavior while serving as Acting EMA Director did not reflect well upon her ability to serve as permanent Director.[162]

As the Eleventh Circuit observed in a frequently-cited opinion, *Combs v.*

---

[161] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[162] *See* doc. no. 27 (Defendant's Brief in Support of Summary Judgment), at 22-23.

*Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519 (11th Cir. 1997):

> When deciding a motion by the defendant for judgment as a matter of law in a discrimination [or retaliation] case in which the defendant has proffered nondiscriminatory reasons for its actions, the district court's task is a highly focused one. The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct," *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994) (citation omitted). The district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Sheridan* [*v. E.I. DuPont de Nemours and Co.*, 100 F.3d [1061,] 1072 [(3d Cir. 1996)] (citation and internal quotation marks omitted); *see also Walker*, 53 F.3d at 1564 (Johnson, J., concurring) (discussing methods of proving pretext). However, once the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action. At that point, judgment as a matter of law is unavailable.

*Combs*, 106 F.3d at 1538 (alterations supplied). *See also Hulbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (citing *Wascura v. City of South Miami*, 257 F.3d 1238, 1245-46 (11th Cir. 2001)).

In order to survive summary judgment, plaintiff must persuade this court that *both of* the reasons stated by defendant as the basis for its decision to prefer Johnny

Cantrell over plaintiff were merely pretexts for unlawful gender discrimination. *See Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000) ("In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that *each of* the employer's proffered nondiscriminatory reasons is pretextual.") (emphasis supplied).

Moreover, Title VII requires a showing that "some *illegal, discriminatory intent* as opposed to purely personal or otherwise non-prohibited animus truly motivated the personnel involved" in the adverse employment decision. *Abel*, 210 at 1339 (emphasis supplied).

Plaintiff attempts to prove pretext in four ways. First, she states that her acts of misconduct cannot be used to prove that she was not "qualified."[163] The question of whether plaintiff was *qualified* to serve as EMA Director — and this court found in Part V.C. of this Opinion, *supra*, that she was qualified for the position — does not inform her ability to demonstrate *pretext*, but only her ability to establish a *prima facie* case.[164]

Second, plaintiff states that some of the criteria upon which the Commission based its selection of Cantrell were not requirements set forth in the EMA Director

---

[163] Doc. no. 32 (Plaintiff's Response in Opposition to Summary Judgment), at 23-24.

[164] If plaintiff is trying to suggest that it was unreasonable for the Commission to believe that Johnny Cantrell was *more qualified*, the court does not agree. See the discussion in Part III.X of this Opinion, *supra*.

job listing.[165]  The only authority cited by plaintiff in support of her contention that

such conduct evinces pretext is the following statement by the Middle District of

Alabama in an unpublished opinion:

> It may be that under different facts, *not currently before the court*, this
> court would agree that a plaintiff may establish pretext where an
> employer relies on a qualification that was not listed in the position
> announcement, such as a case in which the successful applicant also has
> a deficiency in the minimal requirements.

*Marshall v. Daleville City Board of Education*, No. 1:05-cv-386-WHA, 2006 WL

2056581, at *24 (M.D. Ala. July 24, 2006) (emphasis supplied).  That statement

merely is *dicta* within nonbinding authority.  Moreover, the scenario contemplated

by that court — *i.e.*, a "case in which the successful applicant also has a deficiency

in the minimal requirements" — cannot be said to apply to Johnny Cantrell, who had

worked for the Morgan County EMA longer than plaintiff had worked in the

Lawrence County EMA office, and gained experience handling emergency situations

while serving in the military.  He also articulated innovative ideas during his

interviews, which, the Commission concluded, would manifest in effective EMA

leadership, greater efficiency of the County's telephone and computer systems, and

the County's receipt of federal grant money during a time when the County suffered

---

[165] *See* doc. no. 32 (Plaintiff's Response in Opposition to Summary Judgment), at 24. *See*
doc. no. 28-17 (EMA Director Job Description), at ECF 4-5 ("Knowledge, Skills and Abilities,"
"Physical Characteristics," and "Other Characteristics").

from a reduction in revenue. It cannot be said that Cantrell did not meet the minimal requirements for the position, or that the Commission fabricated irrelevant job requirements in order to place Cantrell in the position.

Third, plaintiff argues that, because she was "at least as qualified" as Cantrell, she should have been "given preference" in accordance with the County Personnel Handbook.[166] Plaintiff did not specify the Handbook provision upon which she relied. Even so, this court reviewed the entire sixty-page Handbook, and found one provision that appears to support plaintiff's contention.

> 4.1.4. Employee Consideration. When a vacancy occurs in the classified or part-time service, all employees, regardless of their category and status of service, may apply for the vacancy. All employee applicants will be evaluated and ranked based upon their job-related qualifications. The names of qualified employees will be integrated into the established eligibility list for the vacancy in accordance with these procedures and guidelines (Chapter 5). *Normally, preference will be given to qualified regular status classified employees; however, an appointing authority will have the right to select an applicant who is not an employee, if that person is considered to be the best qualified.*

Doc. no. 34-1 (Personnel Handbook), at ECF 18 (emphasis supplied). Notably, the emphasized portion of that provision, prefaced as it is with the qualifying adverb "[n]ormally," does not *compel* the Commission to reject external candidates (like Johnny Cantrell) in favor of internal employees (like plaintiff). To the contrary, the provision explicitly authorizes an appointing authority to hire an external candidate,

---

[166] Doc. no. 32 (Plaintiff's Response in Opposition to Summary Judgment), at 24.

"if that person is considered to be the best qualified."  Plaintiff has presented no evidence indicating that the Commission did not consider Johnny Cantrell to be the best qualified candidate for the position of permanent EMA Director.

Finally, plaintiff asserts pretext based upon the Commission's failure to follow the normal hiring policy of having the *entire Commission* interview candidates, because only Commission Chairman Prentis Davis, Commissioner Bobby Burch, and Interim County Administrator Tricia Galbreath conducted plaintiff's first interview for the EMA Director position.[167]  The Eleventh Circuit has acknowledged that an employer's failure to follow its own policies "*may be suggestive* of discrimination." *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985) (emphasis supplied).  Even so, plaintiff has not demonstrated that the Commission's failure to follow the alleged "policy" prejudiced her, because she has neither argued, nor presented evidence showing, that *Johnny Cantrell* was interviewed by the entire Commission during *his* first interview.   In fact, Commissioner Burch testified that the first round of interviews — during which *both plaintiff and Cantrell were interviewed* — were conducted *only by* himself, Prentis Davis, and Tricia Galbreath.[168]

In summary, none of plaintiff's arguments demonstrate that the Commission's

---

[167] *Id.* at 25; doc. no. 1 (Complaint), ¶ 16.  Plaintiff does not cite to this policy in the Personnel Handbook.

[168] *See* doc. no. 28-2 (Burch Deposition), at 74-76.

stated reasons for failing to select her as EMA Director were merely a pretext for unlawful gender discrimination. Because she cannot show that any of the contested employment decisions were the result of prohibited gender bias, summary judgment is due to be granted in favor of the Commission on plaintiff's Title VII claim.

## VI. AGE DISCRIMINATION CLAIMS

Plaintiff also asserts claims of age discrimination under the federal Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a)(1) ("ADEA"),[169] as well as the Alabama Age Discrimination in Employment Act, Ala. Code § 25-1-20 (1975) ("AADEA").[170] Another judge in this District held in *Henry v. Jefferson County Personnel Board*, 519 F. Supp. 2d 1171 (N.D. Ala. 2007) (Proctor, J.), that a plaintiff could not simultaneously pursue claims under both the ADEA and AADEA:

> The Alabama Age Act plainly states that it is a statute of alternative, not duplicative, relief. "The starting point for all statutory interpretation is the language of the statute itself." *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999). The Alabama Age Act provides that plaintiffs "may elect to pursue their remedies under Title VII . . . and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *or in the*

---

[169] *See* doc. no. 1 (Complaint), ¶¶ 59-71; *see also* doc. no. 51-2 (EEOC Charge of Age Discrimination), at ECF 2. 29 U.S.C. § 623(a)(1) provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." The prohibitions of the Age Discrimination in Employment Act are "limited to individuals who are at least 40 years of age." 29 U.S.C. § 631(a).

[170] *See* doc. no. 1 (Complaint), ¶¶ 72-77.

*alternative* bring a civil action in the circuit court of the county in which the person was or is employed." Ala. Code § 25-1-29 (1975) (emphasis added).[171]  The Alabama Age Act clearly entitles a plaintiff to only "one recovery of damages." Ala. Code § 25-1-29 (1975). Because the plain language of the Alabama Age Act forces a plaintiff to choose *either* suit under the ADEA *or, in the alternative*, suit under the Alabama Age Act, and because Plaintiff in this case has filed suit under the ADEA, the court finds that Plaintiff's claim under the Alabama Age Act is duplicative. Having determined that Plaintiff may only pursue her federal ADEA claim in this case, the court turns to the substantive analysis of that claim.[172]

*Henry*, 519 F. Supp. 2d at 1185-86 (ellipsis supplied, emphasis and footnotes in original), *aff'd*, 252 F. App'x 308 (11th Cir. 2007). This court finds the rationale of

---

[171] Section 25-1-29 provides, in its entirety:

> Any person aggrieved may elect to pursue their remedies under Title VII of the Civil Rights Act of 1964 as amended, and the Age Discrimination in Employment Act 29 U.S.C. Section 621 or in the alternative bring a civil action in the circuit court of the county in which the person was or is employed for such legal or equitable relief as will effectuate the purposes of this article. However, if an action is brought in the federal court, any action pending in the state court shall be simultaneously dismissed with prejudice. Further, any party bringing action under this section shall only be entitled to one recovery of damages. Any damages assessed in one court will offset any entitlement to damages in any other state or federal court. In any action, a person shall be entitled to a trial by jury of any issue of fact in any action for recovery of amounts owed as a result of a violation of this article, regardless of whether equitable relief is sought by any party in the action. Any employment practice authorized by the federal Age Discrimination in Employment Act shall also be authorized by this article and the remedies, defenses, and statutes of limitations, under this article shall be the same as those authorized by the federal Age Discrimination in Employment Act except that a plaintiff shall not be required to pursue any administrative action or remedy prior to filing suit under this article.

Ala. Code § 25-1-29 (1975).

[172] In any event, the court notes that the analysis of Plaintiff's claims under the Alabama Age Act and the ADEA is the same. *See, e.g.*, *Bonham v. Mortgage, Inc.*, 129 F. Supp. 2d 1315 (M.D. Ala. 2001).

the *Henry* opinion to be persuasive, and holds that plaintiff's AADEA claim is due to be dismissed as duplicative.

In cases based upon the federal ADEA statute, the plaintiff has the ultimate burden of proving that age was a determinative factor in the employer's adverse employment decision.

> When a plaintiff alleges disparate treatment, "liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993). That is, the plaintiff's age must have "actually played a role in [the employer's decisionmaking] process and had *a determinative influence* on the outcome." *Ibid.*

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000) (alteration in original) (emphasis supplied).

A plaintiff may prove an employer's intention to discriminate on the basis of age in three ways: *i.e.*, "by direct evidence of discriminatory intent; by meeting the test originally set out for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); or by statistical proof of a pattern of discrimination." *Verbraeken v. Westinghouse Electric Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989); *see also, e.g., Alphin v. Sears, Roebuck & Company*, 940 F.2d 1497, 1500 (11th Cir. 1991) (same); *Earley v. Champion Int'l. Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990) (same). Plaintiff has not presented, nor does she allege that there is, direct evidence of age

discrimination.[173]   She also has not offered statistical proof of a pattern of discrimination on the basis of age.  Accordingly, she must support her claims with circumstantial evidence in accordance with the burden-shifting framework initially developed for use in Title VII cases by the Supreme Court's opinion in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).[174]

## A.   Disparate Disciplinary Treatment

There are four elements of a *prima facie* claim for discriminatory discipline based upon the plaintiff's age:  (1) the plaintiff must show that she was a member of

---

[173] "Only the most blatant remarks, whose intent could only be to discriminate on the basis of age constitute direct evidence." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1992).

[174] Even though the *McDonnell Douglas* opinion and its progeny — *e.g.*, *St. Mary's Honor Center v. Hicks*, 509 U.S. (1993), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981) — involved discrimination claims under Title VII, a variant of the analysis also has been consistently applied to claims based upon the ADEA. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141-42 (2000) (noting widespread use of *McDonnell Douglas* framework to analyze age-discrimination claims based upon circumstantial evidence, and assuming, but not holding, that it applies to ADEA claims) (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311 (1996) (assuming that *McDonnell Douglas* analytical framework applies to ADEA claims based on circumstantial proofs)). *See also, e.g., Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*) (same); *Bogle v. Orange County Board of County Commissioners*, 162 F.3d 653, 656 (11th Cir. 1998) ("Since Bogle has presented no direct evidence that Orange County discharged him because of his age and relied, instead, on circumstantial evidence, the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, . . ., governs his ADEA case.") (ellipsis supplied); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998) (applying *McDonnell Douglas* framework in an ADEA case); *Mitchell v. Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 566 (11th Cir. 1992) (same); *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir. 1991) (same); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987) ("This court applies a slightly modified version of the test set forth in *McDonnell Douglas Corp. v. Green*" when evaluating the strength of circumstantial evidence to prove a prima facie case of age discrimination.). *See also, e.g., Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 175 n.2 (2009); *Childress v. Caterpillar Logistics Services, Inc.*, No. 09-12772, 2010 WL 827907, at *1 n.3 (11th Cir. Mar. 11, 2010).

the class of persons protected by the ADEA — *i.e.*, that she was at least forty years of age on the date discipline was imposed;[175] (2) she was qualified to perform the duties of her job; (3) she was subjected to a tangible adverse disciplinary sanction (*e.g.*, suspended without pay for twenty work days); and (4) the employer treated similarly-situated employees who were either less than forty years of age, or "substantially younger" than plaintiff, more favorably. *See, e.g.*, *Brooks v. CSX Transportation, Inc.*, 555 F. App'x 878, 883 (11th Cir. 2014) (listing *prima facie* elements of, *e.g.*, ADEA "discriminatory discipline or termination" claim). *See also MacKenzie v. Denver*, 414 F.3d 1266, 1277 (10th Cir. 2005) ("[T]he requirements of a prima facie claim of disparate treatment require a plaintiff to produce evidence at a minimum establishing (1) that she was a member of the protected class, (2) she was disciplined, and (3) she was treated differently than similarly-situated non-protected employees for the same or similar conduct.") (alteration supplied).   *Cf.*, *e.g.*, *Maynard. v. Board of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003) (Title VII racially-discriminatory discipline claim).

When deciding whether employees are similarly situated, district courts are directed to "consider whether the employees are 'involved in or accused of the *same or similar conduct* and are disciplined in different ways.'" *Brooks*, 555 F. App'x at

---

[175] 29 U.S.C. § 631(a) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age.").

883 (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)) (emphasis supplied).   As stated in Part V.A., *supra*, plaintiff has not identified any other employee who was involved in, or accused of, similar misconduct.   Moreover, for reasons similar to those discussed in the same Part of this Opinion, she cannot sidestep her obligation of producing a comparator under the narrow holding of *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011).   As is the case regarding her claim of gender discrimination, there is no "convincing mosaic of circumstantial evidence" that she was discriminated against on the basis of her age.   Accordingly, she cannot establish a *prima facie* case of discriminatory discipline under the ADEA.

**B.   Demotion to Plaintiff's Former Position of Deputy EMA Director**

When a demotion is the adverse action complained of, a plaintiff may establish a *prima facie* case by showing that (1) she was at least forty years of age, (2) she was demoted, (3) she was qualified to perform the duties of the job from which she was demoted, and (4) *a substantially younger person was placed in or promoted into her former position.  See, e.g.*, *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1997) (discussing *prima facie* elements in the context of "an ADEA case involving discharge, demotion, or failure to hire") (citing, *e.g.*, *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) (stating that an ADEA plaintiff must show that he was replaced by someone "substantially younger," not

89

necessarily by someone under age 40)).  Indeed, an ADEA disparate treatment claim

is not like a Title VII race or sex discrimination claim, because

> the plaintiff in an age discrimination case need not necessarily prove
> that his replacement was outside the protected class, that is, under forty
> years of age.  The plaintiff in an age discrimination case may establish
> a prima facie case merely by establishing that his replacement was
> younger than he, provided that the discrepancy between the ages, along
> with any other relevant evidence, is sufficient that a fact finder could
> reasonably infer age discrimination.

*Corbin v. Southerland International Trucks*, 25 F.3d 1545, 1549 (11th Cir. 1994).

Plaintiff, who was fifty-two years of age on the date she was demoted to her

former position of Deputy EMA Director, was a member of the group of persons

protected by the ADEA.  She also was qualified to perform the duties of Acting EMA

Director.[176]  Accordingly, it must be determined whether plaintiff's replacement was

"substantially younger" than she.

When plaintiff was demoted, she was replaced as Acting EMA Director by

Tammy Vinson,[177] who was 2 years, 9 months, and 28 days younger than plaintiff.[178]

The Eleventh Circuit has held that an age difference of *just a few years* may be

sufficient to establish that a plaintiff was replaced by someone "substantially

---

[176] See the discussion in Part V.C., *supra* (finding that plaintiff was qualified to perform duties of Deputy EMA Director position), and Part V.D., *supra* (finding that plaintiff was qualified to perform duties of permanent EMA Director position).

[177] See the discussion in Parts III.L. and III.U., *supra*.

[178] *Compare* doc. no. 36-1, at ECF 39 (showing plaintiff's date of birth) *with* doc. no. 59-1 (showing Tammy Vinson's date of birth).

younger." *See, e.g., Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354,

1360 (11th Cir. 1999) (five-year difference sufficient); *Carter v. DecisionOne Corp.*,

122 F.3d 997, 1003 (11th Cir. 1997) (*per curiam*) (three-year difference sufficient);

*Carter v. Miami*, 870 F.2d 578, 583 (11th Cir. 1989) (four-year difference sufficient).

Even so, the Eleventh Circuit offered a message of caution in a recent opinion:

> We recognize that we have previously held, *in cases where plaintiffs presented substantial evidence of discriminatory animus beyond mere age difference*, that a smaller age difference was sufficient to meet the "substantially younger" element of the ADEA *prima facie* case. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1990) (holding that a 37-year-old was "substantially younger" than a 42-year-old). But we agree with the district court that, in this case, [the plaintiff] failed to create an inference of discrimination because a six-year age difference, without more, does not establish that [the plaintiff's] age was the but-for cause of the School Board's failure to hire him. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996) ("The prima facie case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion."). *See also Steele v. United States VA*, 2011 U.S. Dist. LEXIS 58200, 2011 WL 2160343, at *10 (M.D. Fla. June 1, 2011) (concluding that a 13-year age difference, without more, is insufficient to meet this standard); *Matthews v. City of Dothan*, 2006 U.S. Dist. LEXIS 91711, 2006 WL 3742237 at *12 (M.D. Fla. Dec. 18, 2006) (ruling that six-year age difference was insufficient to create an inference of age discrimination, when no other evidence of discriminatory animus was present).

*Suarez v. School Board of Hillsborough County, Florida*, No. 15-12891, 2016 WL

212503, at *9 n.1 (11th Cir. Jan. 19, 2016) (emphasis and alterations supplied). *See*

*also O'Connor*, 517 U.S. at 313 (describing the three-year difference between a 68-

year-old plaintiff and his 65-year-old replacement as "very thin evidence" of age discrimination, and stating that an inference of age discrimination "cannot be drawn from the replacement of one worker with another worker *insignificantly younger*") (emphasis supplied).

This court therefore must determine whether, *in addition to the almost three-year age difference between plaintiff and Tammy Vinson*, there is substantial evidence of discriminatory animus. The record contains neither direct nor circumstantial evidence of prohibited age bias. Plaintiff testified in her deposition that no one ever told her that the Commission took any of the adverse employment actions against her on account of her age.[179] Moreover, there is no evidence that anyone made comments to plaintiff about her age, or the age of any other employee. Furthermore, there is no evidence that the Commission was systematically eliminating older employees. Finally, there is no Eleventh Circuit case holding that an age difference of less than three years, without additional evidence of age discrimination, is sufficient to satisfy the "substantially younger" element. Accordingly, plaintiff cannot establish a *prima facie* case of age discrimination in the Commission's act of demoting her to her former position of Deputy EMA Director.

## C.    Termination by Elimination of the Deputy EMA Director Position

---

[179] Doc. no. 28-1 (Morgan Deposition), at 94.

In order to make out a *prima facie* case for discriminatory termination of employment under the ADEA, a plaintiff must show that (1) she was a member of the class of persons protected by the Act — that is, individuals who are at least forty years of age,[180] (2) she was discharged, (3) she was qualified to perform the duties of the job from which she was dismissed, and (4) she was replaced by a person who was either less than forty years of age, or "substantially younger." *See, e.g., Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000); *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311 (1996); *Bogle v. Orange County Board of County Commissioners*, 162 F.3d 653, 656-57 (11th Cir. 1998); *Turlington v. Atlanta Gas Light* Co., 135 F.3d 1428, 1432 (11th Cir. 1998); *Jameson v. Arrow Company*, 75 F.3d 1528, 1531 (11th Cir. 1996); *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207-08 (11th Cir. 1997); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1469-70 (11th Cir. 1991); *Earley v. Champion International Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990); *Verbraeken v. Westinghouse Electric Corp.,* 881 F.2d 1041, 1045 (11th Cir. 1989); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987).

Plaintiff satisfies the first three elements. Even so, the record does not contain any evidence that the Deputy Director position was eliminated as a result of

---

[180] 29 U.S.C. § 631(a) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age.").

prohibited age bias.  Plaintiff testified during her deposition that none of the County

Commissioners or their agents ever stated that her position was eliminated as a result

of her age.[181]  There also is no evidence that the Commissioners were systematically

eliminating older workers, or took any other actions that demonstrated an age-related

bias.  Accordingly, plaintiff cannot establish a *prima facie* case of age discrimination

in the elimination of the Deputy EMA Director's position.

### D.    Failure to Hire Plaintiff as Permanent EMA Director

Plaintiff also claims that the Commission discriminated against her on the basis

of her age when it rejected her, and selected Johnny Cantrell, to fill the EMA

Director's position vacated by the retirement of Hillard Frost.[182]  When a plaintiff

alleges that an employer failed to hire her because of her age, she must show that (1)

she was a member of the class of persons protected by the ADEA (that is, individuals

who are at least forty years of age),[183] (2) she was qualified to perform the duties of

the job she sought, (3) she was not hired, and (4) the position was awarded to a

person who was either less than forty years of age, or "substantially younger" than

plaintiff.  *See, e.g.*, *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th

Cir. 1998) (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308

---

[181] *See* doc. no. 28-1 (Morgan Deposition), at 94.

[182] Doc. no. 32 (Plaintiff's Response in Opposition to Summary Judgment), at 22.

[183] 29 U.S.C. § 631(a) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age.").

(1996)). Here, the only disputed element is the last: the question of whether Johnny Cantrell — who was 48 years, 10 months, and 2 days old on the date he was selected as EMA Director — was "substantially younger" than plaintiff, who was 52 years, 4 months, and 23 days old on the same date.[184] (Stated differently, Cantrell was 3 years, 6 months, and 28 days younger than plaintiff.)

As discussed in the immediately preceding Part of this Opinion, such an age difference *may be* sufficient to satisfy the "substantially younger" element. *See, e.g.*, *Carter v. DecisionOne Corp.*, 122 F.3d 997, 1001, 1003 (11th Cir. 1997) (three-year difference sufficient when considered in conjunction with the decision-maker's

---

[184] *Compare* doc. no. 36-1, at ECF 39 (showing plaintiff's date of birth) *with* doc. no. 35-1, at ECF 40, and doc. no. 36-1, at ECF 46 (both of which indicate Cantrell's date of birth). "[R]eplacement by one within the protected category [*i.e.*, over 40 years of age] will not *preclude* proof of a prima facie case." *Pace v. Southern Railway System*, 701 F.2d 1383, 1390 (11th Cir. 1983) (alterations supplied, emphasis in original). Even so, "in no case does the court hold that as a matter of law a prima facie case is established if a plaintiff simply shows [she] is in the protected group, was adversely affected by an employment decision, was qualified and was replaced by one younger than [herself]." *Id.* at 1390 (alterations supplied). To the contrary, the Eleventh Circuit has stated:

> The mere fact that one employee is replaced with another who is younger certainly does not, without more, give rise to an inference that age was even considered in the decision to dismiss or demote the first employee. Historical experience does often lend support to suspicions that replacements of black with whites or women with men are not coincidental. *However, whenever employees are replaced, their replacements are invariably either older or younger than they are, and the distinctions are usually unimportant.*

*Goldstein v. Manhattan Industries, Inc.*, 758 F.2d 1435, 1443 (11th Cir. 1985) (emphasis supplied). Thus, the plaintiff is not required to prove that she was replaced by someone less than 40 years of age, but only by someone "substantially younger." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996).

statements (a) that he "had gotten rid of the 'old sleazy people' employed by the Company when he began running it," and (b) that "it was preferable to have a nubile young woman making sales calls because a sales prospect might grant her an interview just to take a look at her"); *Carter v. Miami*, 870 F.2d 578, 580, 583 (11th Cir. 1989) (four-year difference sufficient where decisionmaker stated that he did not want his office run by "little old Jewish ladies").

Nevertheless, the Eleventh Circuit also held in a more recent opinion that a *six-year* difference in age, without any other evidence of age discrimination, is not sufficient. *See Suarez v. School Board of Hillsborough County, Florida*, No. 15-12891, 2016 WL 212503, at *9 n.1 (11th Cir. Jan. 19, 2016). In other words, the question of whether a comparator is "substantially younger" than a plaintiff depends not only upon the numerical difference in age, but also upon the factual context of the case — that is, whether there is *other evidence of discrimination on the basis of age*.

There is no evidence *in addition to the approximately 3.5-year age difference between plaintiff and Cantrell*, much less substantial evidence, indicating that the Lawrence County Commissioners took the age disparity into account when selecting Cantrell, rather than plaintiff, as permanent EMA Director. Plaintiff testified in her deposition that she had "assume[d]" that Cantrell was "[a]round fortyish" when he was selected as Director, and that she had based that assumption on "[h]is young

96

children and just conversations that we [*i.e.*, plaintiff and Cantrell] had had and stuff."[185]  When asked what facts made her believe age was the reason she was not selected as permanent Director "as opposed to something else," plaintiff replied: "Well, one of the things was I was a 52-year-old female that had applied for the job and a much, I assumed, younger male had received the job."[186]  Even so, she testified that no one ever "ma[de] comments to [her] suggesting that [she] did not get the position because of [her] age."[187]  Finally, when asked at the end of her deposition whether there were any reasons not previously discussed as to why plaintiff believed she had been a victim of age discrimination, she replied, "no."[188]

Plaintiff cannot demonstrate any evidence of age discrimination aside from the fact that an individual who was about three-and-a-half years her junior received the position for which she had applied.  Under the law of this Circuit, that age difference, without more, is not sufficient to satisfy the "substantially younger" element. Accordingly, plaintiff cannot establish a *prima facie* case of age discrimination in the Commission's failure to hire her as permanent EMA Director.

In light of all of the foregoing, plaintiff's claims of age discrimination are due

---

[185] Doc. no. 28-1 (Morgan Deposition), at 87 (alterations supplied).

[186] *Id.* at 93-94.

[187] *Id.* at 94 (alterations supplied)

[188] *Id.* at 157.

97

to be dismissed.

## VII. RETALIATION CLAIM

Finally, plaintiff alleges that the series of maneuvers that effectively terminated her employment — *i.e.*, (*i*) she was suspended without pay for twenty work days, and demoted to her former position of Deputy EMA Director on November 19, 2013, (*ii*) the Commission voted one week later (on November 26, 2013) to eliminate the position of Deputy EMA Director as of December 3, 2013, thereby effectively terminating her employment by eliminating the position she occupied before the end of her twenty-work-day suspension;[189] and (*iii*) she was not hired for the permanent EMA Director position on December 23, 2013 — were carried out in retaliation for her act of filing an EEOC charge on November 15, 2013.[190]

Generally speaking, a plaintiff must prove three elements in order to establish a *prima facie* retaliation claim under any of the federal employment discrimination statutes: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected

---

[189] See the discussion in Part III.W., *supra*.

[190] *See* doc. no. 32 (Plaintiff's Response in Opposition to Summary Judgment), at 28-30; doc. no. 28-1 (Morgan Deposition), at 101-02. Plaintiff supplemented her original EEOC charge on December 5, 2013, with a charge of retaliation, and again on April 24, 2014, with a charge of age discrimination. *See* doc. no. 36-1 (EEOC Charge of Sex and Disability Discrimination), at ECF 39; doc. no. 51-1 (EEOC Charge of Retaliation), at ECF 2-3; doc. no. 51-2 (EEOC Charge of Age Discrimination), at ECF 2-3.

conduct and the adverse employment action. *See, e.g., Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002); *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1117 (11th Cir. 2001); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000).

> Once a *prima facie* case is established, the burden then shifts to the defendant employer to come forward with legitimate, non-discriminatory reasons for its actions that negate the inference of retaliation. *See Goldsmith* [*v. City of Atmore*, 996 F.2d [1155], 1163 [(11th Cir. 1993)]. The plaintiff must then demonstrate that she will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation. *Cf. Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 440 (11th Cir. 1996).

*Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1287 (11th Cir. 1997) (alterations supplied).

Commission Chairman Prentis Davis hand-delivered a letter to plaintiff on October 30, 2013, notifying her of his intent to terminate her employment for cause, effective November 5, 2013. (See doc. no. 28-15, at ECF 6, and the discussion in Part III.Q., *supra*).

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on November 15, 2013, *sixteen days after* her receipt of the October 30th letter described in the preceding paragraph, *and ten days after* the November 5th date on which Chairman Davis stated her termination for cause would

take effect.[191]   The act of filing an EEOC charge clearly constituted "protected

expression." *See, e.g., Bass v. Board of County Commissioners of Orange County,*

*Florida,* 256 F.3d 1095, 1117 (11th Cir. 2001); *Gupta v. Florida Board of Regents,*

212 F.3d 571, 587 (11th Cir. 2000).

On November 19, 2013, *four days after* plaintiff filed her EEOC charge,

Chairman Davis hand-delivered another letter to plaintiff, informing her that: (1) he

had changed his mind, and decreased the sanction for the conduct enumerated in his

letter from termination of employment to suspension without pay for twenty work

days; (2) her temporary appointment as Acting EMA Director had been rescinded by

the Commission's appointment of Tammy Vinson as "Acting EMA Director" on

October 8, 2013; and (3) she had been reassigned to her former position of Deputy

EMA Director.  (See doc. no. 28-15, at ECF 8, and the discussion in Parts III.L and

III.U., *supra*).

On November 26, 2013, *eleven days after* plaintiff filed her EEOC charge, the

Commission abolished the Deputy EMA Director position, and County Attorney

David Martin sent plaintiff a letter notifying her that her employment effectively

would be terminated on December 3, 2013.  (See doc. no. 37-1, at ECF 44, and the

discussion in Part III.W., *supra*).

---

[191] Doc. no. 32 (Plaintiff's Response in Opposition to Summary Judgment), at 28.

On December 23, 2013, *thirty-nine days after* plaintiff filed her EEOC charge, the Commission rejected her application for the position of EMA Director, and selected Johnny Cantrell instead. (See the discussion in Part III.X., *supra*.)

Thus, plaintiff suffered a series of adverse employment actions after filing her EEOC charge. The disputed element of plaintiff's *prima facie* case is whether there was a causal linkage between plaintiff's protected conduct and the subsequent adverse employment actions.

The Eleventh Circuit has stated that, "[t]o establish a causal connection, a plaintiff must show that 'the decision-makers [were] aware of the protected conduct,' and 'that the protected activity and the adverse action were not wholly unrelated.'" *Gupta*, 212 F.3d at 590 (quoting *Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999)) (first alteration supplied, second in original). "For purposes of a prima facie case, 'close temporal proximity' *may be sufficient* to show that the protected activity and the adverse action were not 'wholly unrelated.'" *Gupta*, 212 F.3d at 590 (quoting *Farley*, 197 F.3d at 1337) (emphasis supplied).

Even so, "when an employer *contemplates an adverse employment action before an employee engages in protected activity*, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (emphasis

101

supplied).  *See also Clark County School District v. Breeden*, 532 U.S. 268, 272 (2001) (observing that an employer's act of "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality").

Defense counsel argued during the motion hearing held on May 18, 2016 that, because plaintiff's employment with the Lawrence County Commission was fated to end either way — *i.e.*, regardless of whether the mechanism for achieving that result was plaintiff's *termination for cause*, or the *elimination of the position to which she was demoted following the events that occurred between September 30 and October 6, 2013* — plaintiff cannot demonstrate that her act of filing an EEOC charge on November 15, 2013 *motivated* the Commission to take adverse employment actions against her after that date.

Moreover, the record suggests that the Commission was contemplating the elimination of the Deputy EMA Director position at least as early as October 22, 2013,[192] more than three weeks before plaintiff filed her EEOC charge.

In response, plaintiff's counsel referenced another case from this district that, he believes, provides some clarification about the causation principles articulated by

---

[192] *See* the discussion in Part III.P., *supra*, and doc. no. 28-5, at ECF 20 (Oct. 22, 2013 Minutes, recording that:  "Commissioner Hargrove made a motion to table the Deputy Director Classification.  Commissioner Jones gave a second and all Commissioners voted aye.").

the Supreme Court in *Breeden*, and the Eleventh Circuit in *Drago*. *See Jones v. Water Works Board*, No. 2:10-cv-1323-AKK, 2012 WL 2856651 (N.D. Ala. July 5, 2012) (Kallon, J.).

In *Jones*, the plaintiff asserted a claim of retaliation under Title VII and 42 U.S.C. § 1981. *See id.* at *7. The record revealed that the employer's human resources ("HR") representative recommended, in an email dated June 6, 2008, that the plaintiff be given a "final warning" for misconduct. *Id.* at *13. Three days later, on June 9, 2008, the plaintiff "complained of discrimination and retaliation" in a letter to that same HR representative. *Id.* Then, approximately one month later, on July 11, 2008, plaintiff was fired. *Id.* The defendant-employer argued, based upon the holdings in *Breeden* and *Drago*, that the plaintiff could not prove the causation element of a *prima facie* retaliation claim because she had sent her letter to the HR representative — *i.e.*, engaged in protected expression — *after* the employer "had already begun investigating and contemplating" possible disciplinary actions against the plaintiff, as evidenced by the HR representative's June 6th email. The district judge disagreed. He first noted that the Supreme Court's opinion in *Breeden*, as well as the Eleventh Circuit's opinion in *Drago*, had both addressed a fact scenario in which

> *the precise adverse employment action contemplated by the defendant*

103

> before the plaintiff's statutorily protected activity actually occurred.
> The defendant in *Breeden* contemplated *transferring* plaintiff before the
> statutorily protected activity, and the plaintiff asserted that the *transfer*
> constituted an adverse employment action.      532 U.S. at 271-72.
> Similarly, in *Drago*, the defendant considered *demoting* plaintiff five
> months prior to plaintiff's statutorily protected activity, and plaintiff
> alleged that this *demotion* served as the adverse employment action.
> 453 F.3d at 1307-09. Conversely here, the evidence shows that, before
> HR received Plaintiff's complaint letter, the [employer] contemplated .
> . . asking [plaintiff's direct supervisor] to *discipline Plaintiff. . .*;
> however, there is no evidence that the [employer] contemplated
> *discharging Plaintiff* prior to her statutorily protected activity. . . . As
> such, the court refuses to find Plaintiff's retaliation claim precluded
> under *Breeden* and *Drago*.

*Jones*, 2012 WL 2856651, at *13 ( emphasis and ellipses supplied). In other words,

Judge Kallon held that the plaintiff satisfied the element of causation — in spite of

the fact that an allegedly adverse employment action (in the form of issuing plaintiff

a disciplinary "final warning" for misconduct) was contemplated by the employer

prior to her protected expression — because the action that was *actually carried out*

(*i.e.*, termination) was different from and more tangible than the action *previously*

*contemplated.*

This court agrees that the imposition of a *more draconian* adverse employment

action following an act of protected expression would support a finding that the

protected expression *led to* an act of retaliation. In the present case, however, it

cannot be said that the severity of the adverse employment action *increased* after

plaintiff filed her EEOC charge.[193]  However clumsily the Commission ultimately achieved the separation of plaintiff from employment with the County, the result was the same:  plaintiff's employment was terminated.

Defense counsel also argued, both in brief, and at the May 18, 2016 motion hearing, that the manner in which plaintiff's employment was ultimately terminated (*i.e.*, elimination of her position *versus* termination for cause) actually *benefitted* plaintiff: *i.e.*,

> Prentis Davis had originally proposed Plaintiff's termination for cause, but he reduced the proposed discipline in light of Plaintiff's prior service and employment history after Plaintiff's due process hearing.  It is true that Plaintiff ended up without a job either way . . . . [Even so, termination for cause] would have made Plaintiff *ineligible for rehire; would have placed her unemployment benefits in jeopardy; and would have been a permanent black mark on her job history.*

---

[193] For reasons this court does not fully comprehend, plaintiff's counsel vehemently argued during the motion hearing held on May 18, 2016 that the court should accept the veracity of the notation on Chairman Davis's November 19th letter to plaintiff, stating that the letter was "Drafted: November 11, 2013." *See* doc. no. 28-15, at ECF 8." Counsel's argument, as this court understands it, was that the notation demonstrated that the adverse employment action ultimately taken against plaintiff (*i.e.*, suspension without pay for twenty work days) was contemplated at least as early as November 11, 2013, four days before plaintiff filed her EEOC charge.  Under the legal principles set forth in *Breeden* and *Drago*, that argument would only bolster the *Commission's contention* that the plaintiff's protected expression on November 15, 2013 did not cause the Commission to suspend her without pay for twenty work days.  Even if plaintiff's counsel meant to argue that, *prior to* plaintiff's filing her EEOC charge, the adverse employment action was suspension without pay (without more), and, after plaintiff's filing her EEOC charge the adverse employment action not only was suspension without pay, but also demotion, and elimination of the position to which she was demoted, that argument also would not aid the plaintiff. The record contains substantial evidence that the elimination of the Deputy Director position was seriously considered by the Commission prior to November 15, 2013. Moreover, plaintiff's demotion actually occurred on October 8, 2013, when the Commission unanimously voted to designate Tammy Vinson as Acting EMA Director.

Doc. no. 27 (Brief in Support of Summary Judgment), at 27 (ellipsis, alteration, and emphasis supplied).  There is merit to that argument.

In light of all of the foregoing, the court concludes that the causation principles set forth in *Drago* and *Breeden* preclude plaintiff from demonstrating a *prima facie* case of retaliation in her suspension without pay for twenty work days, demotion to the position of Deputy Director, and the subsequent elimination of the Deputy Director position.

With regard to her claim of retaliation in the Commission's rejection of her application for the permanent EMA Director position, there also is abundant evidence that the Commission contemplated taking that adverse employment action prior to receiving notice, on November 15th, that plaintiff had filed an EEOC charge. Plaintiff's acts of misconduct occurred between September 30th and October 6th. Almost immediately thereafter, on October 7th, Chairman Davis sent plaintiff a letter informing her that she was being placed on administrative leave with pay, and stating that he was "concern[ed] for the safety of the citizens of Lawrence County, including [plaintiff]."[194]  The following day, the Commission unanimously passed a resolution designating Tammy Vinson as Acting EMA Director, apparently (and reasonably) believing that it would be inappropriate or unsafe to allow plaintiff to continue to

---

[194] Doc. no. 28-15, at ECF 2 (alterations supplied).

serve in that capacity.[195]   Finally, and perhaps most tellingly, Chairman Davis

informed plaintiff in an October 30, 2013 letter that her employment was being

terminated for cause.[196]   The second paragraph of that letter stated:

> This termination is based on the culmination of an investigation
> into recent events in which you were involved.  *The events have
> damaged relationships in the community, with the members of the
> Lawrence County Commission and within the Lawrence County
> Commission office, while also raising serious questions regarding your
> judgment and leadership abilities.*

Doc. no. 28-15, at ECF 6 (emphasis supplied).  The immediacy of the Commission's

response to the events of September 30th through October 6th, the safety concerns

expressed by Chairman Davis in his letters to plaintiff, and the fact that plaintiff was

slated for termination make it clear that the Commission believed, *prior to the date

on which plaintiff filed her EEOC charge*, that she was not a suitable candidate to

serve as permanent EMA Director.

In light of the principles set forth in *Drago* and *Breeden*, plaintiff cannot

establish a *prima facie* case of retaliation for any of the adverse employment actions

taken against her after the date on which she filed her EEOC charge.  Therefore,

summary judgment is due to be granted in favor of the Commission on plaintiff's

retaliation claims.

---

[195] Doc. no. 28-5, at ECF 17 (Minutes of Oct. 8, 2013 Meeting).

[196] *See* doc. no. 28-15, at ECF 6.

## VII. CONCLUSION AND ORDERS

For all of the reasons discussed in the foregoing opinion, it is ORDERED that defendant's "Motion to Strike or, in the Alternative, for *In Camera* Review" be, and the same hereby is, GRANTED IN PART, and DENIED IN PART. Defendant's motion for summary judgment is GRANTED, and all claims alleged by plaintiff are dismissed with prejudice. Costs are taxed to plaintiff. The Clerk is DIRECTED to close this file.

**DONE** and **ORDERED** this 20th day of June, 2016.

_____
United States District Judge

108